512 A.2d 1047

**UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND and United Wire, Metal and Machine Pension Fund**

v.

**STATE Of Maryland DEPOSIT INSURANCE FUND CORPORATION.**

No. 19, Sept. Term, 1986.

Court of Appeals of Maryland.

Order April 17, 1986.

Opinion July 28, 1986.

Albert H. Turkus (Jonathan B. Hill, Peter H. Doyle, Dow, Lohnes & Albertson, Washington, D.C., Michael A. Pace, Dow, Lohnes & Albertson, Annapolis, and John M. Brickman, Peirez, Ackerman & Levine, Great Neck, N.Y., of counsel and Sidney L. Meyer, New York City, of counsel, all on brief), for appellants.

Martin B. Ellis and Shale D. Stiller (Diana G. Motz, Evelyn W. Pasquier, William L. Reynolds, of counsel and Frank, Bernstein, Conaway & Goldman, on brief), Baltimore, for appellee.

## ORDER

For reasons to be stated in an opinion later to be filed, it is this 17th day of April, 1986

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the order of the

Circuit Court for Baltimore City dated March 5, 1986 be, and it is hereby, affirmed with costs; and it is further

ORDERED that the mandate shall issue forthwith.

Argued Before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

Old Court Savings & Loan, Inc. (Old Court) is an insolvent corporation which is in liquidating receivership. Appellants had challenged the Governor's General Distribution Plan for Old Court depositors (the Plan). By a mandate issued on April 17, 1986, with opinion to follow, this Court affirmed a circuit court order which rejected appellants' challenge. We now state our reasons underlying that mandate.

This case grows out of the emergency in this State created by the financial failures in the spring of 1985 of some of the largest Maryland chartered savings and loan associations. The general background is described in W. Preston, *Report of the Special Counsel on the Savings & Loan Crisis* (1986) and in *Chevy Chase Savings & Loan, Inc. v. State,* 306 Md. 384, 387–97, 509 A.2d 670, 672–75 (1986). Those failures also rendered insolvent the private insurer of state-chartered associations, Maryland Savings-Share Insurance Corporation (MSSIC). At a special session of the Maryland General Assembly convened that spring, MSSIC was merged into a new state agency, created within the Department of Licensing and Regulation, the State of Maryland Deposit Insurance Fund Corporation (MDIF). MDIF assumed MSSIC's role as insurer of depositors' accounts. That obligation is, in general, to pay the net loss on a depositor's account in an insolvent association, determined after liquidation has been completed.

In May of 1985 Old Court had been placed in conservatorship under the jurisdiction of the Circuit Court for Baltimore City which imposed a moratorium on withdrawals by depositors. Subsequently, limited withdrawals were permitted for certain emergency obligations of depositors. Fol-

lowing the conservatorship, losses in Old Court had been consistently estimated to exceed $200 million and the association was beyond hope of rehabilitation. In November the circuit court ordered Old Court into a liquidating receivership of which MDIF is the receiver. Restrictions on withdrawals were continued. There are 34,497 Old Court depositors whose accounts total approximately $600 million.

On January 10, 1986, the Administration's Savings and Loan Financing Plan was announced. It dealt with five financially troubled associations, including Old Court. It presented a general financial plan for implementing the various strategies proposed for different associations. The general financial plan contemplated using $80 million in MDIF insurance fund liquid assets, the $70 million balance of a 1985 bond authorization, $100 million in interfund borrowing by MDIF from the Transportation Trust Fund, and $70 million in general fund appropriations, of which $55 million were to be a FY 1986 deficiency appropriation. As to Old Court the financing plan proposed that during calendar year 1986 MDIF would "provide for advance insurance payments of approximately $100 million, or 50 percent of the expected insurance losses." It was further stated that "[t]he advance funding program will also cash out small accounts." The details of a distribution of State funds to Old Court depositors set forth in the Plan with which this case is concerned evolved from the January general financing plan.

On March 3, 1986, MDIF, in its capacity as receiver of Old Court, moved that the circuit court authorize the receiver "to take such steps as the Receiver deems reasonably necessary in order to facilitate implementation of the [P]lan...." The features of the Plan with which we are concerned are:

—Each depositor with an aggregate deposit balance of less than $100 will receive payment in full from the State.

—Each depositor with an aggregate deposit balance between $100 and $5,000 will receive an interest-bearing transaction account at Maryland National Bank with a

deposit balance equal to that depositor's former Old Court accounts.

—Each depositor with an aggregate deposit balance exceeding $5,000 will receive $5,000 from the State.

—Each depositor with an Individual Retirement Account (IRA) balance of $100,000 or less will receive an interest-bearing IRA at Maryland National Bank with a deposit balance equal to that depositor's former Old Court IRA.

MDIF's motion represented that in order to fund the Plan the Governor was arranging for the transfer of $100 million from the Transportation Trust Fund to a special State fund created for the purpose of receiving and distributing monies from the Transportation Trust Fund. It further represented that additional funds required for the Plan beyond that $100 million would be provided either from appropriations in the FY 1987 budget or from MDIF's insurance fund. The receiver's motion told the court that "[n]o Old Court assets, nor any funds generated from the sale of any Old Court assets, will be used by the State or MDIF to fund any part of the [Plan]."

Among the depositors at Old Court are United Wire, Metal and Machine Health and Welfare Fund and United Wire, Metal and Machine Pension Fund (the Funds). Their deposits in Old Court total approximately $16 million. In connection with earlier proceedings in the conservatorship/receivership of Old Court, the circuit court had granted the Funds full intervenor status.

The Funds opposed the receiver's motion. Their object was to force a pro rata distribution, at least indirectly, by thwarting the utilization of receivership assets in administering the State funds to be disbursed pursuant to the Plan. Basically the Funds asserted that the circuit court could not authorize the receiver to proceed as the motion had requested because the disparate treatment of depositors under the Plan violated the rule of pro rata distribution and was state action which deprived the Funds of equal protection.

The court conducted a hearing at which counsel were heard but at which no testimony was taken. The circuit court found that the Plan did not involve a distribution of Old Court assets. It further found that the accounts of some 17,000 depositors in Old Court would be fully paid by the distribution called for in the Plan and that eliminating those depositors from further participation in the receivership would reduce the costs of administering the receivership as to the remaining depositors who would not have been paid in full.

The court entered an order authorizing the receiver to proceed as requested and the Funds appealed from that order. We granted certiorari before consideration of the appeal by the Court of Special Appeals.

The Funds contend that the circuit court erred because it permitted the receiver to participate in implementing a plan which "would fundamentally alter the nature of risks shared by co-equal depositors" in Old Court. This argument rests on the common law principle recognized in *Wyman v. McKeever*, 239 Md. 130, 133, 210 A.2d 537, 539 (1965), namely:

> The general rule, now firmly established by the great majority of the cases on the subject, is that after a building association has become insolvent in fact, even though this is not known, the right of every shareholder to equality in the distribution attaches as a paramount equity and no shareholder has the right to defeat that equality by withdrawing, perfecting an incompleted attempt to withdraw, or retaining the fruits of a completed withdrawal.

Insofar as a distribution in liquidation of the assets of an insolvent Maryland chartered savings and loan association is concerned, the principle of equality is now embodied in a statute and means a pro rata distribution.[1] The distribution

---

1. Chapter 11 of the Acts of 1986, an emergency measure effective April 3, 1986, added to the Financial Institutions Article of Md. Code

under the Plan is not, however, a distribution of the assets of Old Court in liquidation.[2] The circuit court so found as a fact and the Funds do not contend otherwise. If a rule of pro rata distribution is to be applied to the Plan, it must rest on some other basis. But it is also clear that the principle of equality of treatment extends beyond the distribution of assets of an insolvent savings and loan association. We have recently analogized to *Wyman v. McKeever, supra,* in rejecting the attempted withdrawal by a former MSSIC member association after the insolvency of MSSIC of that member's capital contributions to the MSSIC fund used to insure depositor's accounts. *See Chevy Chase Savings & Loan, Inc. v. State, supra.*

The Funds also refer to the assumption by MDIF of the MSSIC insurance obligations. Appellants say that "[t]he unfortunate reality is that the State must supplement the [MDIF] insurance fund, or renege on [the State's] insurance obligation." The Funds call the State's financing of the Plan "a partial—but perhaps the State's only—contribution to fulfill this pledge." Because only those Old Court depositors whose accounts are not paid in full under the Plan bear the risk that the State will not "fulfill this pledge," the Funds say the rule of pro rata treatment is violated.

This spin on the pro rata argument views distribution under the Plan as the economic equivalent of an advance

---

(1980) a number of new sections including § 9–712. That section in part provides:

(f) In any distribution of assets on liquidation of a savings and loan association for which a receiver has been appointed under Section 9–708 of this part III:

(1) All unsecured claims of any class of priority shall be paid in full, or provision made for payment, before any claims of lesser priority are paid, and if there are insufficient funds to pay any class of claims of one priority in full, distribution to claimants in such class shall be made pro rata[.]

2. In the context of this case the concept, "assets" of Old Court, does not include the MDIF obligation. We express no opinion on whether the obligation of MDIF as insurer of the accounts in Old Court is in any way an asset of that association.

payment of insurance on deposits by MDIF. If we assume, *arguendo*, that such is the correct legal characterization of the payments under the Plan, the rule of pro rata treatment would still not apply. Section 10–110.1(c) of the Financial Institutions Article (FI), enacted by Ch. 12 of the Acts of 1986 on an emergency basis and effective April 3, 1986, provides in relevant part as follows:

(c) Subject to any other conditions established under law, if the Fund Director is reasonably satisfied that an insurable loss will be incurred upon final liquidation, in order to facilitate the payment of deposit insurance to depositors of a member association and to reasonably reduce the administrative costs of a liquidation, including demands on any hardship withdrawal plan, the Fund may, either upon final liquidation or earlier, and either from available monies in the Fund or from any other State funds advanced to the Fund for that purpose:

. . . .

(2) Make a cash payment or payments, in an amount equal to all or· *any portion* of the depositors' savings accounts, to *any* or all *of the depositors* of a member association in receivership[.]   [Emphasis added.]

This statute abolishes any common law rule of pro rata distribution which might otherwise have been applicable to payment of MDIF insurance made in advance of determining the net loss on a depositor's account after ultimate liquidation of the insolvent association, whether the monies paid were available in the MDIF insurance fund or whether the State advanced the monies to the insurance fund.

Although Ch. 12 was not in effect at the time the circuit court entered the order appealed from, an appellate court ordinarily applies the law in effect at the time the case is decided. *See Pickett v. Prince George's County,* 291 Md. 648, 662, 436 A.2d 449, 457 (1981); *Mraz v. County Commissioners,* 291 Md. 81, 433 A.2d 771 (1981); and *McClain v. State,* 288 Md. 456, 419 A.2d 369 (1980).

■ If, on the other hand, the payment by the State to Old Court depositors pursuant to the Plan is not, in legal effect, an advance payment on MDIF's insurance obligation, then, under the parties' arguments, the Plan distribution would be "voluntary [S]tate action," as MDIF's brief characterizes it. If we assume, *arguendo*, that that characterization is correct, a rule of pro rata distribution nevertheless would not apply. The terms governing distribution of a legally nonobligatory contribution would be those set by the State, as the contributor, so long as the terms were within constitutional limits. To the extent that any common law principle of pro rata treatment of depositors in an insolvent savings and loan might clash with the right of the voluntary contributor to specify the recipients of the contribution, the terms of the Plan must govern in this case. Under FI § 10–110.1(c) State monies advanced to MDIF for payment of deposit insurance before final liquidation of insured associations may be paid to depositors on other than a pro rata basis. Payments to Old Court depositors under the Plan also reduce MDIF's insurance obligation even though the payments are not made through MDIF in its capacity as insurer. As a matter of policy there is little difference whether MDIF is the vehicle of payment in its capacity as insurer or as receiver. Consequently, even if the State's payments to the Plan are voluntary, we will not prohibit the receiver from participating in the Plan's distribution because to do so would override the legislative policy underlying FI § 10–110.1(c).

■ A court could enjoin the proposed distribution if the differences in treatment of Old Court depositors under the Plan violated the equal protection clause of the Fourteenth Amendment to the Constitution of the United States or art. 24 of the Maryland Declaration of Rights, as interpreted by this Court. *See Attorney General v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 940–41 (1981) and cases cited therein. Contrary to the argument made by the Funds, the Plan does not violate equal protection.

In their argument appellants emphasize *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) in which the Court struck down on equal protection grounds the plan under which Alaska paid cash, in varying amounts, to adult residents from that state's mineral resources income. *Zobel* supports the Funds' position that unequal distribution of state benefits is subject to scrutiny under the equal protection clause, but "[g]enerally, a law will survive that scrutiny if the distinction it makes rationally furthers a legitimate state purpose." *Id.* at 60, 102 S.Ct. at 2313, 72 L.Ed.2d at 677–78. *Zobel* is otherwise not particularly instructive in the case before us. The Alaskan plan which was adopted in 1976 gave dividend credit to an individual for each year of residence beginning in 1959 when Alaska became a state. This retroactive feature bore no rational relation to legitimate state purposes.

In the case before us there are at least two legitimate state purposes intended to be served by the Plan. One is to alleviate to a degree the financial hardship suffered by Old Court depositors by making some cash available before the liquidation process fully runs its course. Another legitimate purpose is to reduce to some degree the costs of administering the receivership. The rules for testing whether there is a rational relationship between those purposes and the Plan have been frequently stated. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–02 (1970) distills the rules as follows:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 [ (1911) ]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscien-

tific." *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 [ (1913) ]. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 [ (1961) ].

*Dandridge* sustained against equal protection challenge a Maryland imposed limit on the total dollar amount of welfare payments to a family although the limit, in the case of the largest families, resulted in total income which fell below certain need standards determined on an aggregate per capita basis. *Dandridge* concluded by observing that "the Constitution does not empower [courts] to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* at 487, 90 S.Ct. at 1163, 25 L.Ed.2d at 503. *See also Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

In their argument, the Funds, who are attacking the constitutionality of the Plan, attempt to shift to the receiver the burden of proof. The Funds say that MDIF never quantified the savings to be effected by the Plan and that MDIF has never furnished any comparisons to the costs of administration if a pro rata distribution scheme had been adopted in the Plan. MDIF had no such obligation. "If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed." *Whiting-Turner Contracting Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985). *See also State v. Good Samaritan Hospital,* 299 Md. 310, 327–28, 473 A.2d 892, 900–01, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984).

Here the State has a limited amount of resources to be applied to the savings and loan problems in general and an even more limited amount of resources to be applied to the problems in Old Court. The estimates in the record are that the Plan will require approximately $110 million. By means

of the State, in one sense, purchasing the positions in Old Court of depositors whose aggregate deposit balances are $5,000 or less, together with the IRA accounts of $100,000 or less, the number of accounts in Old Court is roughly halved from 34,000 to 17,000. There is a rational relationship between reducing the number of accounts and reducing the cost of administration.

The Funds focus particularly on the Plan's including IRA's in the transfer of certain accounts out of Old Court into fully liquid accounts at Maryland National Bank. MDIF says that there is a substantial question whether Old Court, as a "bank" in receivership, can continue to serve as the trustee of an IRA and cites Internal Revenue Code (IRC), § 408(a)(2), § 408(n)(1)–(n)(3), and § 581. The Funds say that the cited sections do not support that assertion. MDIF says that distributions from an IRA account before age 59½ cannot be made without severe tax consequences to the depositor, especially if more than one distribution is made in a twelve-month period. The Funds say that pursuant to IRC § 408(d)(3) any distribution made from an IRA may be rolled over within sixty days to a new IRA without any tax consequences. They reject as speculation MDIF's concern about a second distribution made within a twelve-month period. MDIF says that at age 70½ IRA depositors must begin making withdrawals and suggests that the receiver would be constrained to hire an actuary to deal with the technical tax issues which would arise if a pure pro rata distribution under the Plan produced a shortfall in the amount required to be withdrawn by an IRA depositor in that age bracket. The Funds say that IRC § 4974(c) requires only that the depositor notify the IRS that reasonable steps are being taken to remedy any shortfall.

■ These arguments sufficiently demonstrate that IRA accounts present problems which are different from other accounts. One can reasonably foresee that, had a pro rata distribution been made under the Plan across the board, the depositors in IRA accounts would have peppered the MDIF

staff with questions about the effect of the distribution on their personal situations. We can conceive that the Governor and other state officials sought to eliminate those complications by including IRA accounts up to $100,000 in the transfer of accounts to Maryland National Bank. A rational basis requires no more.

This conclusion can be illustrated by *Washabaugh v. Washabaugh*, 285 Md. 393, 404 A.2d 1027 (1979). Prior to the creation of the Circuit Court for Baltimore City there were six trial courts in Baltimore City, known collectively as the Supreme Bench, having jurisdiction above the level of courts of limited jurisdiction. Twenty-two judges served on the Supreme Bench. *Washabaugh* dealt with a challenge to the assumed exclusion of the Supreme Bench from the otherwise Statewide availability of in banc appeals. We held that "[t]his proliferation of courts and judges necessarily would cause greater difficulty and inconvenience in coordinating in banc appeals in Baltimore City than in any other circuit, thereby constitutionally justifying the elimination from the judicial process of this type of an appeal in [Baltimore City]." *Id.* at 410, 404 A.2d at 1037.

The Funds also argue that IRA's could not have been constitutionally included in the Plan without also including multi-employer benefit funds, such as themselves, which are maintained pursuant to the Employees' Retirement Income Security Act of 1974 (ERISA). Appellants say they are the repository of health and welfare funds and of pension funds for approximately 8,000 workers and their families. But the accounts at Old Court on which the Funds are the depositors simply represent the investment decision of the managers of the Funds on behalf of the 8,000 workers. Those accounts are not IRA accounts of the workers and do not present the special problems in administration outlined above.

It was for the foregoing reasons that we affirmed the judgment of the Circuit Court for Baltimore City.