563 A.2d 402

Dennis M. SILVERMAN et al., Trustees

v.

MARYLAND DEPOSIT INSURANCE FUND
CORPORATION et al.

No. 16, Sept. Term, 1989.

Court of Appeals of Maryland.

Sept. 12, 1989.

Benjamin Rosenberg (Rosenberg Proutt Funk & Greenberg, Lawrence S. Greenwald, Nancy E. Paige, Jeffrey Schwaber, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Sidney L. Meyer, New York City, John M. Brickman, Peirez, Ackerman & Levine, Great Neck, N.Y.), on brief, for appellant.

Dennis M. Sweeney, Deputy Atty. Gen. and Mark D. McCurdy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Martha Vestal Clarke, Asst. Atty. Gen., on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

Appellants are fiduciaries who deposited trust funds in Old Court Savings and Loan, Inc. (Old Court), a Maryland chartered association, where deposits were then insured by Maryland Savings–Share Insurance Corporation (MSSIC). Both Old Court and MSSIC became insolvent. One of the appellees, State of Maryland Deposit Insurance Fund Corporation (MDIF), is a governmental corporation and agency of the State of Maryland which has assumed the insurance obligations of MSSIC. A dispute exists between appellants and MDIF, acting through its director, the other appellee, Lloyd W. Jones (Jones), over the method of computation of the amount of insurance payable by MDIF to appellants. Appellees successfully argued in the Circuit Court for Baltimore City, and argue here, that their contract constructions are correct and, in any event, that sovereign immunity as to MDIF, and a statutory immunity as to Jones, prevent courts from considering whether appellees have misconstrued the insurance plan they administer. We shall hold, as explained below, that the constructions by the appellees are generally correct, but that appellants are permitted to attempt to show that Old Court has mistakenly or unauthorizedly recorded the number of appellant's deposit accounts.

This is another lawsuit arising out of the 1985 savings and loan crisis in Maryland. The development of the crisis is described in detail in W. Preston, *Report of the Special Counsel on the Savings & Loan Crisis* (1986) (Preston). Aspects of the response by the State of Maryland to the crisis may be found in Md.Code (1980, 1986 Repl.Vol., 1988 Cum.Supp.), §§ 9–701 through 9–712 of the Financial Institutions Article (FI), relating to receiverships and conservatorships of state chartered savings and loan associations, and in FI §§ 10–101 through 10–121, relating to MDIF. Aspects of the State's response to the crisis also have been

described in *United Wire, Metal & Machine Health & Welfare Fund v. Board of Savings & Loan Ass'n Comm'rs,* 316 Md. 236, 558 A.2d 379 (1989); *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988); *United Wire, Metal & Machine Health & Welfare Fund v. State Deposit Ins. Fund,* 307 Md. 148, 512 A.2d 1047 (1986); and *Chevy Chase Savings & Loan v. State,* 306 Md. 384, 509 A.2d 670 (1986). We shall not recount that history here.

Procedurally we have here two appeals in one record. Each action below was a complaint for declaratory judgment, mandamus and other appropriate relief against MDIF and Jones. In one action the plaintiffs are the trustees of United Wire, Metal & Machine Pension Fund (Pension Fund) and in the other action the plaintiffs are the trustees of United Wire, Metal & Machine Health & Welfare Fund (Welfare Fund). We shall refer to Pension Fund and Welfare Fund collectively as United Wire. United Wire had in excess of $16 million on deposit at Old Court when Old Court failed.

MDIF's role in the factual background of this appeal is twofold. It is the court appointed receiver of Old Court and it is the insurer of accounts at Old Court. The latter capacity results from the statutory merger of MSSIC into MDIF which expressly included the transfer to MDIF of all of the assets and all of the liabilities, including insurance liabilities, of MSSIC. *See* Acts of the First Special Session of 1985, Ch. 6, § 4 (uncodified). Funds for the payment of MDIF's outstanding liabilities as insurer are or may be made available from the assets of MSSIC and from public funds which have been or in the future may be appropriated pursuant to the policy declared in FI § 10–116. It reads:

> "It is the policy of this State that funds will be appropriated to [MDIF] to the extent necessary to protect holders of savings accounts in member associations, and to enable [MDIF] to meet its obligations under a hardship withdrawal plan or partial distribution of assets."

In general, and grossly oversimplified, the limit of MSSIC's insurance liability was $100,000 per account, as

opposed to $100,000 per depositor. Old Court's records reflected some $8.4 million of deposits by Pension Fund in forty-three accounts. MDIF determined that nearly $700,-000 of Pension Fund's total deposits were uninsured. Old Court's records reflected some $8.5 million of deposits by Welfare Fund in twenty-nine accounts. MDIF determined that some $5.6 million of Welfare Fund's total deposits were uninsured. These determinations by MDIF were explained in its letters dated October 21, 1987, to United Wire and were based in part on information submitted by United Wire to MDIF.

United Wire then filed the instant complaints against MDIF, as insurer and as receiver, to which Jones was added by amendment as a defendant, both individually and as Director of MDIF. The complaints raise claims under state nonconstitutional law and under federal and state constitutional law to which the defendants responded by motions to dismiss or, in the alternative, summary judgment. United Wire's nonconstitutional claims were rejected both on immunity grounds and on the merits. The constitutionally based claims were rejected on the merits. United Wire appealed, and we issued the writ of certiorari on our own motion prior to consideration of the matter by the Court of Special Appeals.

United Wire raises the following issues. We have revised the order of presentation of these issues because we choose to address the merits first, and to consider sovereign immunity only as to any meritorious claims.

I. Whether the lower court erred in dismissing the trustees' claim that MDIF and Jones are violating the trustees' rights under the statutory scheme:

A. Whether in addition to insurance of $100,000 for each beneficiary of the Pension Fund, the trustees are entitled to insurance of $100,000 for each Pension Fund account.

B. Whether the trustees are entitled to insurance of $100,000 for each beneficiary of the Welfare Fund.

C. Whether the trustees are entitled to be reimbursed for loss up to $100,000 per account after liquidation proceeds have been applied to each account.

D. Whether the trustees have the right to prove at trial the correct number of accounts which they would have held in Old Court but for the mistakes of Old Court.

II.  Whether the lower court erred in holding that sovereign immunity bars this action.

III.  Whether the lower court erred in dismissing the trustees' claims under the Constitution and 42 U.S.C. § 1983:

A.  Whether MDIF and Jones are taking the trustees' property without just compensation.

B.  Whether MDIF and Jones are depriving the trustees of property without due process of law.

C.  Whether the trustees have stated a valid claim against Jones under 42 U.S.C. § 1983.

I

Statutes and MSSIC by-laws govern the specific contentions of United Wire concerning computation of the amount of insurance payable.  Chapter 6 of the Acts of the First Special Session of 1985, § 6 (uncodified) provided that "any account established on or before [May 18, 1985] shall be subject to the same terms and conditions of insurance under [MDIF] as that account was subject under [MSSIC]."

The overarching limitation on MSSIC's insurance liability was set forth in Md.Code (1980), FI § 10–105(b) which read:

"The amount of loss to be protected against for each separate savings account may not exceed the limit established from time to time in [MSSIC's] bylaws, rules, and regulations.  This limit may not exceed by more than $10,000 the amount of prevailing insurance available from the Federal Savings and Loan Insurance Corporation [FSLIC]."

The parties and the circuit court have accepted that the amount MSSIC established as its limit is $100,000.[1]

---

1.  We have not been furnished with the MSSIC by-law, rule or regulation which fixes that amount.  Section 2–702 of the MSSIC by-laws is referred to in by-laws §§ 2–704(G) and 3–702 as defining the insurance liability limit, but by-law § 2–702 essentially tracks former FI § 10–105(b).

By-law § 2–702 reads:

"*Insurance Liability Limits.  The limit of insurance liability for which the Corporation may be required to pay for each separate share account of any association may not exceed by more than the sum of $10,000 the amount of prevailing insurance available from the Federal Savings and Loan Insurance Corporation or its successor instrumentality from time to time.*"

**312**

### A

■ With respect to Pension Fund's deposits at Old Court, MDIF, in its October 21, 1987, letter to Pension Fund, took the position that there was insurance

"for the greater of (1) up to $100,000 per account, or (2) aggregating the accounts, up to $100,000 per participant or beneficiary of the [Pension] Fund based on the ascertainable interest of each such participant or beneficiary, plus up to $100,000 to the extent of the amount in the accounts not attributable to such ascertainable interests."

The ratio of the total value of all accrued benefits of participants in the Pension Fund to the total assets of the Pension Fund was .905271195 as of December 31, 1985. MDIF has aggregated the Pension Fund accounts, applied the foregoing percentage to the total on deposit of $8.4 million and considered the product, some $7.6 million, to be insured. Pension Fund does not challenge this approach to that point. MDIF further considers that it additionally insures $100,000 of the approximately $800,000 difference. MDIF says that the remaining $700,000 is uninsured because it is not attributable to ascertainable interests. Pension Fund submits that it, as the fiduciary of these trust accounts, is also insured in each and every account, over and above the beneficiaries of ascertainable interests, for a separate and additional $100,000 per account.

Resolution of the dispute turns on the construction of by-law § 3–703 which reads in full as follows:

"Member. As used in this rule, the word 'member' may mean an individual, a partnership, an association, a corporation, an estate, a trust, a pension fund, an agent for any public authority having official custody of public funds, or any other legal entity. A trust or estate or pension fund shall be considered separate and distinct from any beneficiary thereof for the purpose of this rule. Any one fiduciary may represent and act for any number of estates or trusts or beneficiaries, and each such separate estate or trust or beneficiary shall be regarded as a distinct member under this Rule. In the event a fiduciary invests in one free share account funds of more than one

---

A regulation adopted by MDIF utilizes the $100,000 limit of insurance for each account established on or before May 18, 1985. *See* Md.Regs. Code, tit. 09, § 06.07.04A(1) and (2) (1988).

trust or estate or beneficiary which are commingled, each such trust or estate or beneficiary will be considered a member for an amount determined by apportioning the total amount of the free share account to the trust or estate or beneficiary having an interest therein upon the same ratio as the interest of such trust or estate or beneficiary bears to the total commingled funds made by the fiduciary."

In accordance with § 3–703 MDIF has aggregated the deposits in Pension Fund's accounts and applied the apportionment formula to determine the amount thereof representing the interest of beneficiaries, called by MDIF, ascertainable beneficiaries. MDIF attributes the excess, which in reality is part of an overfunding of Pension Fund's liability, to one unascertained beneficiary class which is entitled to an additional $100,000 of insurance. Pension Fund's argument is that it is by definition a "member" and that insurance should also be payable to it, on each account, as a member. This argument relies on by-law § 3–701 which in relevant part reads:

"A free share account is hereby defined ... as the total interest of a member of an association in the share capital of such association.... [T]he term 'share capital' shall mean the aggregate payments made by a member upon the shares of an association ... plus dividends credited thereto less redemptions and repurchase payments. The withdrawal value of a free share account shall be the share capital of a member...."

If § 3–701 applied here, Pension Fund's maximum insurance would be $100,000 per account. Section 3–703, however, establishes a special rule for situations where there are multiple, identifiable, beneficial interests in an account(s). Each separate, beneficial interest is treated as a distinct member, thereby producing in the aggregate more insurance. Pension Fund's argument essentially seeks to have it both ways by aggregating beneficiaries in all accounts and then treating the accounts as separate and looking to Pension Fund as a member for each. We hold that the more particular provisions of § 3–703 govern and that MDIF has correctly applied the by-law.

This conclusion is reinforced by former FI § 10–105(b) which limited the amount of MSSIC insurance to no more

than $10,000 over FSLIC coverage. In the FSLIC program a "trust estate" includes "the interest of a beneficiary in an irrevocable express trust[.]" 12 C.F.R. § 561.4(a) (1988). Trust estates in the same trust, invested in the same association account, are separately insured under the FSLIC program if the value of the trust estate is capable of determination. *See* 12 C.F.R. § 564.2(c)(1).[2] FSLIC insurance with respect to any remaining amounts is determined by 12 C.F.R. § 564.10 which in part provides:

> "All trust estates for the same beneficiary invested in accounts established pursuant to valid trust arrangements created by the same settlor (grantor) shall be added together and insured up to $100,000 in the aggregate, separately from other accounts of the trustee of such trust funds...."

Assuming that there are forty-four Pension Fund accounts at Old Court, Pension Fund's argument would produce $4,300,000 more of MSSIC/MDIF insurance than FSLIC would provide, and the overarching limitation of former FI § 10–105(b) would be violated.

## B

■ Welfare Fund makes an argument similar to that of Pension Fund, discussed in part I A, *supra*. Relying on by-law § 3–703, Welfare Fund submits that there is $100,000 of insurance for each beneficiary of the Welfare Fund

---

**2.** 12 C.F.R. § 564.2(c)(1) reads:

"(c) *Valuation of trust interests.* (1) Trust estates (as defined in § 561.4 of this subchapter) in the same account will be separately insured if the value of the trust estate is capable of determination, as of the date of default, without evaluation of contingencies except for those covered by the present-worth tables and rules of calculation for their use set forth in § 20.2031–10 of the Federal Estate Tax Regulations (26 CFR 20.2031–10): *Provided,* that (i) in connection with pension and other trusteed employee benefit funds (including those qualifying under section 401(d) or section 408(a) of the Internal Revenue Code of 1954), the trust estate of each participant shall be evaluated as if the trust were irrevocable and the interest of the participant had fully vested as of the date of default of the insured institution, and (ii) in connection with deferred compensation plans, the trust estate of each participant shall be evaluated as if the participant were the beneficiary of an irrevocable trust and the interest of the participant had fully vested as of the date of default of the insured institution."

because each beneficiary is a member. Welfare Fund does not inform us how the number of beneficiaries is to be determined. Welfare Fund further argues, either in explanation of its "each beneficiary" argument or in rebuttal to MDIF"s argument, that the *interest* of beneficiaries "can be calculated using sound actuarial and accounting principles, and the trustees [of Welfare Fund] intend to prove as much at trial." United Wire brief at 18. Welfare Fund did not present any evidentiary material on summary judgment illustrating these calculations. More particularly, Welfare Fund does not argue that its computations would be based on present-worth tables.

MDIF"s position is that Welfare Fund's accounts are insured up to $100,000 per account. The circuit court ruled that MDIF"s position was correct as a matter of law. The difference in MDIF"s application of MSSIC by-law § 3–703 to Welfare Fund's accounts, as opposed to the application to Pension Fund's accounts, is that the interest of beneficiaries in the former cannot be ascertained by the use of present-worth tables. That limitation is a restriction on FSLIC insurance found in 12 C.F.R. § 564.2(c)(1). *See supra* note 2. The total value of accrued benefits of participants in Pension Fund could be calculated using present-worth tables, but present-worth tables do not predict who will need sick benefits or for what duration. Unable to compute the interest of each beneficiary in Welfare Fund in the manner required for FSLIC insurance, MDIF determined its insurance was $100,000 per Welfare Fund account. Were MDIF to attempt to devise some method of valuing beneficial interests in Welfare Fund beyond that method specified for FSLIC insurance, MDIF would exceed the overarching limitation on MSSIC coverage of former FI § 10–105(b).

The circuit court granted judgment on the basis of the foregoing legal argument by MDIF and we agree.

## C

The next issue between the parties is whether MDIF correctly applies the liquidating dividend from the Old Court receivership in computing the amount of insurance to be paid. We hold that MDIF does correctly apply the dividend under the clear terms of MSSIC by-law § 2–704. The parties' positions are best presented by an illustration.

We assume a $150,000 account in an insolvent association and a sixty percent dividend from net assets (gross price realized on assets less costs of administration).

| United Wire | | MDIF | | MSSIC By-Law § 2-704 |
|---|---|---|---|---|
| Total account deposit | 150,000 | Total account deposit | 150,000 | |
| Dividend | (90,000) | Dividend | (90,000) | |
| Loss | 60,000 | "Gross Loss" | 60,000 | (F) |
| Insurance Limit | 100,000 | Excess of Acct. Dep. Over Ins. Limit | (50,000) | (G) |
| Ins. Payable | 60,000 | "Net Insurable Loss" | 10.000 | (H) |

United Wire contends that its method is consistent with the application of salvage to insured losses. Even if valid in other contexts, that argument cannot overcome the precise language of MSSIC by-law § 2–704 which the MDIF position faithfully tracks. Section 2–704 in relevant part provides:

"Insurance Liability Determined. Upon the occurrence of an event of a default ... the limit of the Corporation's insurance liability shall be determined as provided herein. Such determination shall be made in the following manner:
. . . .

"(F) The net assets of a member in default shall then be allocated to all free share accounts of such member in the same ratio that the total of such net assets bears to the total of all free share accounts of such member, and the difference between each such free share account and the amount of the net assets so allocable shall be determined. As used in these By–Laws and the Rules and Regulations of this Corporation, such difference shall be defined as the 'gross loss' for each free share account of each member in default.

"(G) There shall be subtracted from the gross loss, as defined in sub-paragraph (F) of this Section, any amount by which the free share account for which insurance was provided by the Corporation exceed[s] the insurance liability limit as defined by Section 2–702, and the resulting amount shall be defined herein as the 'net loss' for each free share account for each member in default.

"(H) From the net loss, as determined in accordance with sub-paragraph (G) of this Section, there shall be

subtracted any insurance applicable to the free share account which sustained such loss as written pursuant to the National Housing Act, as amended, and the difference shall be referred to in these By–Laws and the Rules and Regulations as the 'net insurable loss' of each free share account of a member in default.

"(I) Such loss shall be evidenced by a certificate signed by the Chairman...."

## D

■ Count I of each of the United Wire complaints alleges that the number of United Wire accounts on the books of Old Court is incorrect. The specific allegations are:

"8. Interest on each account was payable monthly, and was paid by mailing a separate, monthly check for each of the accounts.

"9. Receipt of checks for each account each month imposed an undue administrative burden upon [United Wire]. In an effort to alleviate this burden, [United Wire] requested that the checks be combined so that fewer checks would be received. Old Court agreed to combine the checks.

"10. At no time did the trustees authorize Old Court to reduce the number of accounts. However, on information and belief, Old Court purported to reduce the number of accounts on its books to [forty-three as to Pension Fund and twenty-nine as to Welfare Fund].

"11. In purportedly reducing the number of accounts, Old Court acted contrary to the authorization of the trustees."

Noting that the Legislature gratuitously allowed pre-MDIF accounts to be insured on the MSSIC formula, the circuit court held that MDIF's only duty was to insure the registered accounts in existence at the time Old Court was placed into conservatorship [3] and, in support, cited Md.Regs. Code (COMAR) tit. 9, § 06.07.04C (1988).[4] The regulation

---

3. The conservatorship for Old Court was instituted on May 13, 1985. Preston, at 234.

4. COMAR § 09.06.07.04C, dealing with insurance of accounts, provides as to accounts established on, before, and after May 18, 1985, in relevant part as follows:

was first adopted on an emergency basis effective March 19, 1987. *See* 14:8 Md.Reg. 937; 14:9 Md.Reg. 1077. The circuit court found nothing in the statutes relating to MDIF "to impose an affirmative duty on MDIF to ascertain the existence of any pre-May 18, 1985, accounts which were not currently acknowledged by MDIF." The circuit court concluded that United Wire failed to establish any duty on MDIF and thus failed to state a valid claim for relief.

United Wire argues that it should be allowed to prove that Old Court made a mistake so that the account records can be reformed and that MDIF, as insurer, can be required to recognize the reformed accounts in its determination of the amount of insurance. MDIF, in response, argues that any mistake by Old Court may be the basis for a claim against Old Court, but not a basis for MDIF insurance, because MDIF has no obligation to do other than look at the face of the Old Court records as they existed when MDIF was created in order to determine the number of accounts for insurance purposes.

United Wire has sued MDIF in its capacity as receiver for Old Court and as successor to MSSIC. Resolution of the instant problem involves MDIF in both capacities. Resolution of the problem also involves two contracts, one between Old Court, as depository, and United Wire, as depositor, and the other between Old Court, as insured, and MSSIC, as insurer, to which United Wire is a third party beneficiary. *See Shillman v. Hobstetter*, 249 Md. 678, 241

---

"(1) Account registration as of the date that a member association was placed into conservatorship is determinative of insurance coverage pursuant to §§ A and B.

"(2) Records.

"(a) The account records of the member association shall be conclusive as to the existence of any relationship pursuant to which the funds in the account are invested and on which a claim for insurance coverage is founded. Examples would be trustee, agent, custodian, or executor. A claim for insurance based on that relationship may not be recognized in the absence of its disclosure on the records."

COMAR § 09.06.07.04A in general provides that, for accounts established on or before May 18, 1985, "each account" is insured up to $100,000 on the same terms and conditions of insurance as provided by MSSIC. Subsection B of that regulation, dealing with accounts established after May 18, 1985, in general provides that they are insured up to the same limit as that established in the FSLIC program.

A.2d 570 (1968). If Old Court breached a contractual or other legal duty to United Wire by reducing, without authorization, the number of accounts, Old Court could be responsible in damages to be measured by the loss of any additional insurance recovery from MDIF. Those damages, however, would represent only a part of the total deposits of United Wire in Old Court. In the Old Court receivership the participation of United Wire in the liquidating dividend will be in the ratio which the total United Wire deposits bear to the total claims in the receivership. Whether United Wire would be entitled to damages from Old Court is immaterial.[5]

United Wire, however, seeks, not damages, but reformation of the United Wire–Old Court contract. The United Wire allegations, quoted above, state a claim for reformation.[6] Thus the question becomes whether MDIF, as insurer, would be obliged (sovereign immunity aside) to honor a reformation judgment against Old Court, represented by MDIF as receiver.

MDIF's insurance obligation is on the same terms and conditions as was MSSIC's. The problem before us is the same as if only Old Court had failed and MSSIC was faced with United Wire's contentions.[7] Under the Old Court–United Wire contract, Old Court did certain recordkeeping which affects United Wire's rights as a third party beneficiary of the Old Court–MSSIC contract of insurance. Under ordinary contract principles, United Wire is entitled to

---

**5.** United Wire's complaints also include a claim for rescission based on mistake in the number of accounts. We fail to see how that theory benefits United Wire. If the deposit contracts were to be rescinded and the parties ordered to return each other to *status quo ante,* the restitution obligation of Old Court would simply give rise to a claim in the receivership. That theory would also result in there being no account for MDIF to insure.

**6.** A reformation claim based on Old Court conduct prior to MDIF's creation and asserted against Old Court, represented by its receiver, does not implicate sovereign immunity.

**7.** The argument MDIF advances is influenced by the four years from receivership deadline for determining insurable loss, *see* FI § 10–110.-1(b) and by the fact that estimates to the Legislature of the cost of the "bail-out" have not included deposits deemed by MDIF to be uninsured. These factors do not change the Old Court–MSSIC contract.

demonstrate an Old Court error in recordkeeping and reform the Old Court–United Wire contract, in order to affect insurance, particularly where the insurer, MSSIC, is a party to the action through MDIF's joinder in dual capacities.

Indeed, in the context of group life insurance coverage, where records maintained by the insured employer determine rights of employee participants, mistakes by the employer have, in effect, been corrected as a predicate to recognizing a claim. *See Murdock v. Equitable Life Assurance Soc'y of U.S.*, 714 F.2d 474 (5th Cir.1983) (where group policy provided the change of beneficiary would be effective only when written change was designated on the insurance records of the employer at the employer's home office, new beneficiary was allowed to show that secretary employed by the employer-insured failed for more than six weeks prior to death of participant to mail change of beneficiary to home office); *Confederation Life Ass'n v. Allinson*, 95 R.I. 402, 187 A.2d 528 (1963) (where group life policy on state employees required the change of beneficiary be deposited with employer at Division of Accounts and Controls, new beneficiary entitled to show change of beneficiary form was mislaid in interdepartmental mail).

Under MDIF's argument MSSIC by-law § 2–703 limits the determination of the number of accounts to the formal record on the date of the event of default by Old Court. The principal effect of that provision under the facts here is to make the appointment of a conservator for Old Court an event of default.[8] We find nothing in the text of MSSIC

---

**8.** MSSIC by-law § 2–703 reads:

"Events of Default. No payment shall be made by the Corporation with respect to its insurance liability, except as otherwise provided, unless an event of default shall have occurred with respect to any member, as defined by these By–Laws, and until such insurance liability shall have been determined in accordance with Section 2–704. As used in these By–Laws, and in the Rules and Regulations of the Corporation, the term 'event of default' shall mean for any member (A) its adjudication in bankruptcy in accordance with any applicable law of the United States of America, (B) the appointment of a conservator for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled, or (C) the appointment of a receiver for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled."

by-law § 2–703 which would make formal account registration conclusive of insurance coverage.

MDIF also submits that COMAR § 09.06.07.04C, see *supra* note 4, while not directly applicable, is a proper interpretation of by-law § 2–703. The regulation, however, makes the account records of an insured association conclusive only as to the existence of relationships, for example, a deposit made as a trustee, agent, custodian or executor. The problem here concerns the number of accounts into which the total deposits should have been divided, and not the relationships of the depositor to claimant beneficiaries.

COMAR § 09.06.07.04C(2)(a) is almost verbatim 12 C.F.R. § 330.1(b)(1) (1988), relating to the Federal Deposit Insurance Corporation (FDIC) and to 12 C.F.R. § 564.2(b)(1) relating to FSLIC. *Jones v. Federal Deposit Ins. Corp.*, 748 F.2d 1400, 1405 (10th Cir.1984) described the operation of the FDIC regulation to be as follows:

> "The bank records, if accurate and complete in reflecting the intention of the depositor conveyed to the bank, are conclusive in the interpretation of the account status. If a depositor challenges the bank records … as to their correctness, there exists a presumption of correctness which may be overcome by proof that the records do not properly and accurately reflect the instructions of the depositor to the bank."

*Jugum v. Federal Sav. & Loan Ins. Corp.*, 637 F.Supp. 1045, 1049 (W.D.Wash.1986) held that the FSLIC regulation applied only to the question of the relationships specified therein and not to questions of joint versus individual ownership.

Further, even if we were to read COMAR § 09.06.07.-04C(1) ("[a]ccount registration as of the date that a member association was placed into conservatorship is determinative of insurance coverage....") into MSSIC by-law § 2–703, it would not achieve the result which MDIF seeks here. If successful, the United Wire reformation claim would result in correcting the contract between it and Old Court as of a date earlier than the Old Court conservatorship. Thus, in legal theory, the accounts would be in the reformed state on the date the conservator was appointed.

We are of the opinion that MSSIC would have been obliged to honor a reformation of the number of accounts between United Wire and Old Court and that the obligation of MSSIC determines the obligation of MDIF. We cannot so hold, however, if sovereign immunity and/or public official immunity prevent the action now before us from being brought to raise the very issue we believe to be meritorious.

II

■ MDIF concluded that a reformation of the Old Court accounts in accordance with United Wire's contentions would have nothing to do with the amount of MDIF insurance on United Wire's accounts because MDIF considered that the basis for its determination of available insurance was limited to the number of United Wire accounts as they appeared in Old Court's records on May 18, 1985. As shown above, we are of a contrary opinion. MDIF and Jones also contend, however, that, even if their legal conclusion is wrong, it is not subject to review because of immunity.

Appellees rely particularly on certain statutory provisions relating to MDIF and to its Director which are superimposed against the background of sovereign immunity law in this State. MDIF is part of the Department of Licensing and Regulation. *See* Md.Code (1957, 1986 Repl.Vol., 1988 Cum.Supp.), Art. 41, § 8–102(a) and FI § 10–102. MDIF was created by the Acts of the First Special Session of 1985, Ch. 6, an emergency bill effective May 18, 1985. Uncodified § 9 of Ch. 6 had provided that

"[n]o claim of any nature whatsoever shall arise against, and no liability shall be imposed upon, the [MDIF] Director or any officer, director, or employee of [MDIF] or of this State for any statement made or actions taken in good faith exercise of the powers granted and duties imposed under this Act."

No provision in Ch. 6 expressly addressed the nature and extent of any immunity of MDIF.

At the 1986 regular session of the General Assembly, House Bill 1374 was introduced as an administration measure. In introductory form it would have added FI § 10–121 to read in relevant part as follows:

"(a) Notwithstanding any other provision of law and, except as otherwise expressly provided in this section,

[MDIF] retains and may raise the defense of sovereign immunity in any action.

"(b) To the extent of available funds, [MDIF] may not raise the defense of sovereign immunity in an action brought by:

"(1) A savings account holder if the cause of action arises out of [MDIF's] failure to pay an insurance claim on a loss that is finally determined to have been incurred by [MDIF], in accordance with its rules and regulations, that does not include a claim relating to the timing of any payment or interest in excess of that ordered by the court administering the conservatorship or receivership and that ... was legally insured by [MSSIC] under the law in effect prior to May 18, 1985 for accounts opened before that date[.]"

1986 Md.Laws Ch. 12. In the course of passage proposed § 10–121(b) was deleted and there was enacted in lieu thereof a provision, not relevant here, concerning written contracts by MDIF entered into after May 18, 1985. As amended, House Bill 1374 was enacted as Ch. 12 of the Acts of 1986. It included FI § 10–121(a) as set forth above.

Uncodified § 3 of Ch. 12 states in relevant part that "[FI § 10–121], as added by Section 2 of this Act, [is] intended to clarify [MDIF's] exercise of the defense of sovereign immunity. The General Assembly did not intend waiver of immunity by any of the Acts of the First Special Session of 1985. This Act confirms and shall be interpreted to confirm the existence of such ... defenses in any action pending on the date of enactment of this Act."

FI § 10–121 makes quite plain the legislative purpose of having MDIF enjoy sovereign immunity to the full extent of its common law glory in Maryland.

United Wire advances two principal theories why the circuit court erred in applying immunities in favor of MDIF and Jones. Both theories rest on the misconstruction of MSSIC by-law § 2–703 (see part I D, *supra* ). First, United Wire asserts that sovereign immunity does not bar mandamus against a state agency or official to rectify an error of law made in administering a legislatively created program where there is no statutory provision for judicial review. Alternatively United Wire says that appellees acted beyond

their authority, that sovereign immunity does not apply to protect *ultra vires* activity and that the statute conferring qualified immunity on the Director of MDIF, when properly interpreted, does not apply to *ultra vires* activity.

The statutes creating MDIF do not specially provide for judicial review of a MDIF determination of whether and, if so, to what extent insurance is payable on an account with a savings and loan association in which the depositor has suffered a loss. Nor is the October 21, 1987, MDIF determination of the extent of insurance of United Wire's accounts the result of a "contested case" under the Administrative Procedure Act. *See* Md.Code (1984, 1988 Cum. Supp.), § 10–201 of the State Government Article.[9] But the absence of a statutorily based review procedure does not prevent judicial review of MDIF's conclusion that a reformation of Old Court's records could have no effect on its insurance obligations. "This Court in a long line of cases, has consistently held that the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable." *Criminal Injuries Compensation Bd. v. Gould,* 273 Md. 486, 500–01, 331 A.2d 55, 65 (1975).

*Gould* cited twenty-two decisions of this Court in support of the quoted proposition. Those authorities include *State Dep't of Health v. Walker,* 238 Md. 512, 209 A.2d 555 (1965) on which United Wire relies to support the use of mandamus here. In the years following the decision in *Gould,* the proposition therein recognized also has been applied in *Cicala v. Disability Review Bd. for Prince George's County,* 288 Md. 254, 418 A.2d 205 (1980); *Zion Evangelical Lutheran Church v. State Highway Admin.,* 276 Md. 630, 350 A.2d 125 (1976); and *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211,

---

9. Section 10–201(c) reads:

"(c) *Contested case.*—'Contested case' means a proceeding before an agency to determine:

(1) a right, duty, statutory entitlement, or privilege of a person that is required by law to be determined only after an opportunity for an agency hearing; or

(2) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by law to be determined only after an opportunity for an agency hearing."

334 A.2d 514 (1975). During that same period the proposition has been recognized, but not applied, in *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 435 A.2d 747 (1981) and *Prince George's County v. American Fed'n of State, County & Municipal Employees*, 289 Md. 388, 424 A.2d 770 (1981).

Referring to *Hammond v. Love*, 187 Md. 138, 49 A.2d 75 (1946), *Gould* pointed out "that relief by way of mandamus was appropriate where election supervisors, acting as a quasi-judicial body, misconstrued the law and their own statutory powers; and that such illegal action was reviewable without being characterized as 'arbitrary.'" 273 Md. at 503, 331 A.2d at 66. Mandamus was also appropriate "to direct the payment of retirement benefits where the trustees of a municipal retirement system reached an erroneous conclusion of law...." *Id.* at 504, 331 A.2d at 66, referring to *Heaps v. Cobb*, 185 Md. 372, 45 A.2d 73 (1945).

In nonstatutory review cases, where the agency action is alleged to be arbitrary for lack of evidentiary support, the substantial evidence test is applied. *See Dickinson–Tidewater, Inc. v. Supervisor of Assessments*, 273 Md. 245, 256, 329 A.2d 18, 25 (1974).

> "The substantial evidence test, as applied in cases lacking a statutory standard or scope of review, is similar to the tests laid down by the various statutes, and essentially is limited to 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.'"

*Id.* (quoting *Insurance Comm'r v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309–10, 236 A.2d 282, 292 (1967)). And *see Supervisor of Assessments v. Peter & John Radio Fellowship, Inc.*, 274 Md. 353, 335 A.2d 93 (1975); *Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. at 226, 334 A.2d at 523; Tomlinson, *Constitutional Limits of the Decisional Powers of Courts and Administrative Agencies in Maryland*, 35 Md.L.Rev. 414, 421–25 (1975).

In light of the foregoing decisions, the express reservation to MDIF of sovereign immunity does not operate to prevent judicial review of MDIF's rejection of the reforma-

tion theory based on the erroneous belief that MDIF need not apply the results of a reformation of the number of accounts in determining its insurance obligation.

Nor does the statutory immunity conferred on the Director of MDIF prevent mandamus against him in his official capacity. Indeed, that immunity is not even relevant to the issues. The special statutory statement of public official, qualified immunity for any MDIF Director is concerned with personal financial liability and does not prevent suit seeking nonstatutory judicial review. Inasmuch as Maryland constitutional law does not recognize an attempted, total prohibition of judicial review of executive agency action, *see Gould,* 273 Md. 486, 331 A.2d 55, the statute conferring immunity on the Director should not be interpreted to include immunity from mere joinder for purposes of nonstatutory judicial review of agency action.

Consequently, the opinion expressed at the conclusion of part I D, *i.e.,* that MDIF and its Director are obliged to consider the number of accounts as might be determined in a reformation proceeding, becomes a holding.[10]

It is unnecessary for us to decide whether United Wire's mandamus claim might also lie on the theory that the erroneous decision was an *ultra vires* action by MDIF or by its Director. We discern no difference in relief to which United Wire might presently be entitled on its reformation or mandamus claims by the application of the *ultra vires* theory. The reformation and mandamus allegations are the only presently ripe statements of claim on which relief can be granted.[11]

---

**10.** Whether MDIF would have a sovereign immunity defense to a suit for insurance proceeds by United Wire, if MDIF refused to pay insurance proceeds on a reformed number of accounts, is not before us. The issue could be mooted, for example, by United Wire's failure to obtain reformation or by MDIF's decision to include the result of any reformation in the distribution of funds appropriated for MDIF/MSSIC insurance.

**11.** United Wire's *ultra vires* theory has been recognized in a long line of decisions of the Supreme Court of the United States including *City of Fresno v. California,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); *Georgia R.R. & Banking Co. v. Redwine,* 342 U.S. 299, 72 S.Ct.

## III

United Wire further contends that the appellees have taken United Wire's property without just compensation (issue III A) and that the appellees are depriving United Wire of property without due process of law (issue III B) for all of which United Wire seeks declaratory, injunctive and "other" relief. United Wire's claims of property rights based on the contentions which we rejected in parts IA, B and C are without merit for the reasons therein set forth. To the extent that United Wire's claims of property rights are predicated on the results of a reformation of the account records at Old Court, the claims must abide further proceedings.

Issue III C addresses United Wire's claim made under 42 U.S.C. § 1983 against Jones, "acting under color of state law." That claim rests on the same alleged federal constitutional violations discussed in issues III A and B. For the reasons stated as to those issues, the § 1983 claim was, in part, properly dismissed, but the ultimate decision must abide further proceedings.

## IV

On remand, United Wire will be permitted to proceed on Count I (Number of Accounts) and Count IV (Reformation) of the two complaints, for the reasons stated in part I D, *supra*. Consequently, we vacate the judgment of the circuit court as to those counts and remand for further proceedings. If a final judgment in favor of United Wire is entered on the reformation claim asserted in those two counts, then, for the reasons stated in part II, *supra*, Jones, as Director, and MDIF should consider that judgment in determining the amount of insurance applicable to United

321, 96 L.Ed. 335 (1952); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Poindexter v. Greenhow*, 114 U.S. 270, 5 S.Ct. 903, 29 L.Ed. 185 (1885); *United States v. Lee*, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882). The *ultra vires* doctrine has received a degree of recognition in our cases. *See Department of Natural Resources v. Welsh*, 308 Md. 54, 521 A.2d 313 (1986); *Dunne v. State*, 162 Md. 274, 159 A. 751, *cert. denied*, 287 U.S. 564, 53 S.Ct. 23, 77 L.Ed. 497 (1932); *Weyler v. Gibson*, 110 Md. 636, 73 A. 261 (1909). The doctrine has also been sharply criticized because it is a legal fiction. *See, e.g.*, Davis, *Suing the Government by Falsely Pretending to Sue an Officer*, 29 U.Chi.L.Rev. 435 (1962).

Wire accounts at Old Court. Consequently, we vacate the judgments on Counts VI (Mandamus) of the two complaints. Further proceedings on Count VI necessarily abide the result of further proceedings on Counts I and IV.

We further vacate the judgments entered on Counts VII, VIII and IX of the complaints for the reasons stated in part III, *supra.* Further proceedings on those counts similarly abide the result of further proceedings on Counts I and IV.

In all other respects we shall affirm the judgment of the Circuit Court for Baltimore City.

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY IN NOS. 1606 AND 1607 VACATED AS TO COUNTS I, IV, VI, VII, VIII AND IX AND CASES RE-MANDED TO THAT COURT FOR FURTHER PROCEED-INGS CONSISTENT WITH THIS OPINION. IN ALL OTHER RESPECTS THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY ARE AFFIRMED. COSTS TO BE EVENLY DIVIDED BETWEEN APPEL-LANTS AND APPELLEES.

ON MOTION FOR RECONSIDERATION

PER CURIAM.

Appellant, United Wire, has moved for reconsideration of the disposition of Count V in our opinion and proposed mandate reported in *Silverman v. Maryland Deposit Ins. Fund Corp.,* 317 Md. 306, 563 A.2d 402 (1989). Count V of United Wire's complaint asserted a claim for rescission. It was alleged that United Wire had requested Old Court to combine the monthly "interest" checks from Old Court in order to alleviate an undue administrative burden on United Wire, but that Old Court, without authorization, purported to reduce the number of United Wire accounts on its books. We ordered a remand for further proceedings to allow United Wire to attempt to prove a mistake by Old Court which would justify reformation of the number of accounts. Count V was excluded from the remand because

"[w]e fail to see how [the rescission] theory benefits United Wire. If the deposit contracts were to be rescind-ed and the parties ordered to return each other to *status quo ante,* the restitution obligation of Old Court would simply give rise to a claim in the receivership."

317 Md. at 320 n. 5, 563 A.2d at 409 n. 5.

In its motion for reconsideration, United Wire asserts that, if successful on Count V, its claim in the receivership would be as a general creditor and not as a "depositor," *i.e.,* not as a savings share accountholder, so that it would enjoy a priority in distribution under Md.Code (1980, 1986 Repl. Vol.), § 9–329(a)(1) of the Financial Institutions Article.[1] We disagree.

United Wire's position is and always has been that, under its contract with Old Court, it was a depositor. United Wire challenged the Governor's General Distribution Plan for Old Court depositors "because it permitted the receiver to participate in implementing a plan which 'would fundamentally alter the nature of risks shared by co-equal depositors' in Old Court." *United Wire, Metal & Machine Health & Welfare Fund v. State of Maryland Deposit Ins. Fund Corp.,* 307 Md. 148, 154, 512 A.2d 1047, 1050 (1986). United Wire opposed the settlement of litigation against former officers and directors of MSSIC, contending that the claim asserted by MSSIC was an asset of Old Court and that any recovery should have been distributed pro rata among insured and uninsured depositors at Old Court. *See United Wire, Metal & Machine Health & Welfare Fund v. Board of Sav. & Loan Ass'n Comm'rs,* 316 Md. 236, 558 A.2d 379 (1989). United Wire has never contended that the monies which it sent to Old Court were unsecured cash advances made by it, or that it was otherwise a general creditor, in the sense that suppliers of goods and services to Old Court may be general creditors.

The issue between United Wire and MDIF is the extent of insurance on United Wire accounts.

---

1. Md.Code (1980, 1986 Repl. Vol.), § 9–329(a)(1) of the Financial Institutions Article reads:

    "In any distribution of assets on liquidation of a savings and loan association, the priority of claims is as follows:

    (1) In a mutual association:

    (i) General creditors and holders of savings deposit accounts;

    (ii) Holders of savings share accounts; and

    (iii) Contributors to the initial general reserve fund and before June 1, 1986 and to the expense fund under Subtitle 2 of this title[.]"

    MDIF's answer to the motion before us describes Old Court as a capital stock, non-deposit association. The difference is not material to our analysis. *See* § 9–329(a)(2).

How rescission would operate is a question which could arise, under United Wire's allegations, only if United Wire were to be successful in demonstrating mistake which entitled it to some form of equitable relief. The remand accommodates possible equitable relief for mistake by way of reformation. But, if United Wire is successful in demonstrating entitlement to equitable relief, and if United Wire were to reject reformation and insist on rescission, any decree directing the payment of money by Old Court's receiver to United Wire would be a restitutionary remedy. Such a decree would not be an adjudication that there had been a debt due and owing prior to the receivership from Old Court to United Wire as a general creditor.

Further, if we continue to assume, as above, United Wire's entitlement to restitution, the circuit court administering the Old Court receivership could not direct that United Wire be treated as a general creditor because of its right to restitution. That right would simply arise out of Old Court's status as a depositor. Any attempt to accord that status a higher priority would violate the principle that "after a building association has become insolvent in fact ... the right of every shareholder to equality in the distribution attaches as a paramount equity ...." *Wyman v. McKeever*, 239 Md. 130, 133, 210 A.2d 537, 539 (1965). Were United Wire entitled to relief and to elect rescission, it would be, in essence, a depositor which is uninsured by choice. That is why "[w]e fail to see how [the rescission] theory benefits United Wire."

Motion denied.