ALAN JOEL ARONSON AND DIANE JUDITH ARONSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11207-90.      Filed March 18, 1992.

---

Alan Joel Aronson and Diane Judith Aronson, pro se.
*Chalmers W. Poston, Jr.,* for respondent.

JACOBS, *Judge:* This case was heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A and Rule 180.[1] The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, *Special Trial Judge:* In a notice of deficiency issued March 29, 1990, respondent determined a deficiency in petitioners' Federal income taxes for the taxable year 1986 in the amount of $5,028. Following concessions by petitioners,[2] the issues for decision are (1) whether funds received by petitioners constitute distributions from their Individual Retirement Accounts (IRA's) and, thus, are includable in their taxable income for 1986; and (2) if the amounts constitute distributions from petitioners' IRA's includable in their taxable income for 1986, whether petitioners are liable for the additional tax on early withdrawals under section 408(f)(1). At trial, petitioners raised the additional issue of (3) whether they overreported interest income received during 1986 from Community Savings & Loan.

---

[1] All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioners concede they failed to report interest income from Baltimore Federal Financial Services in the amounts of $53 and $88 (totaling $141). In the notice of deficiency, respondent increased petitioners' interest income by $151. Respondent agrees that the omitted interest income was $141 rather than $151 as determined in the notice of deficiency.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. At the time of filing their petition herein, petitioners resided in North Potomac, Maryland.

On February 8, 1985, petitioners each invested in a fixed-rate, 18-month individual retirement account certificate at First Maryland Savings & Loan, Inc. (First Maryland) at an 11.5-percent annual interest rate. First Maryland went into conservatorship on December 20, 1985, and the interest rate on the IRA certificates was reduced to 5.5 percent. On July 19, 1986, First Maryland went into receivership and the Maryland Deposit Insurance Fund (MDIF) was named as the receiver. From that date forward, the certificates ceased to bear interest. Petitioners also lost control over the funds and were unable to withdraw or otherwise to have access to them.

After the commencement of the receivership, petitioners were unsure whether the funds they deposited at First Maryland would be returned to them. However, they did receive two checks from the State of Maryland in 1986, one for $8,373 (Alan J. Aronson) and the other for $2,286 (Diane J. Aronson). The checks totaled the amounts which petitioners had on account in their respective IRA's at First Maryland. The checks were issued by MDIF through the State of Maryland, General Distribution Plan, Department of Licensing and Regulation, acting in its capacity as receiver of First Maryland. The envelope containing the checks did not contain any instructions concerning the tax treatment of the distributions or any requirement that the amounts be rolled over into another IRA within a specified period of time. Petitioners did not deposit these funds into other IRA's within 60 days of receipt of the distributions. Instead, they deposited the amounts into a savings account and at the time of trial, petitioners retained those funds in a savings account. As of December 31, 1986, neither of petitioners had attained the age of 59½ years. Petitioners were aware that distributions from MDIF represented the balances of their IRA's.

Petitioners' 1986 joint Federal income tax return was prepared by an income tax return preparer and was timely filed. Petitioners did not include the amounts of the distributions received from MDIF as income reported on that return. How-

ever, in an attachment to the return, petitioners stated the following:

IRA distributions from—
    First Maryland S&L .................... [1]$10,660
    Less amount rolled over ................. 10,660
    Taxable ............................... 0

[1]The parties stipulated that the two checks received were $8,373 and $2,286 (total $10,659). There is nothing in the record to explain why petitioners reflected $10,660 in the statement attached to the return.

## OPINION

Respondent determined that petitioners received early distributions from their IRA's during 1986 and that they failed to roll over the funds into new IRA's or to report the distributions as income on their 1986 Federal income tax return. Consequently, respondent adjusted petitioners' income to include the distributed amounts and also determined that petitioners were liable for an additional tax in the amount of 10 percent of the distributed amounts since petitioners were less than 59½ years in age at the time of the distributions.

Petitioners argue that the funds they received from MDIF should not be treated as withdrawals from their IRA's for several reasons. First, they argue that the accounts ceased to be IRA's when they were transferred to MDIF. In support of this argument, they note that the interest rate on the accounts at MDIF was zero, whereas they contracted with First Maryland for an 11.5-percent interest rate. They further maintain that the fact they lost control over the funds converted the nature of the accounts. Petitioners also argue that the proceeds cannot constitute distributions of the IRA's since the funds were distributed by the State of Maryland and not First Maryland. They argue that the funds were similar to proceeds of insurance. As an alternate argument, petitioners point to their willingness to reinvest the funds into IRA's and label respondent's position "arbitrary and capricious". With respect to the additional tax, petitioners take the position that the withdrawals were not voluntary and that section 408(f) should not apply in such a situation. Respondent counters that petitioners were aware that the funds received from MDIF represented the balances of their IRA's and that their arguments to the contrary should fail.

The treatment of a distribution of the proceeds of an IRA from a State agency as receiver of an insolvent financial institution is an issue of first impression. The question requires us to consider subsections (d) and (f) of section 408 as they existed in 1986 and determine how they apply to petitioners.

Section 408 contains the internal revenue laws relating to IRA's. Section 408(d) provides for the tax treatment of an IRA distribution. During the year at issue, section 408(d)(1) provided as follows:

Except as otherwise provided in this subsection, any amount paid or distributed out of an individual retirement account or under an individual retirement annuity shall be included in gross income by the payee or distributee, as the case may be, for the taxable year in which the payment or distribution is received. Notwithstanding any other provision of this title (including chapters 11 and 12), the basis of any person in such an account or annuity is zero.

Thus, distributions from an IRA are includable in the recipient's gross income in the year in which the distribution is received. Sec. 408(d)(1). However, this rule does not apply where the entire amount of the distribution is rolled over into another IRA within 60 days of the receipt of the distribution. Sec. 408(d)(3)(A)(i).

In 1986,[3] section 408(f) provided in relevant part:

SEC. 408(f). ADDITIONAL TAX ON CERTAIN AMOUNTS INCLUDED IN GROSS INCOME BEFORE AGE 59½.—

(1) EARLY DISTRIBUTIONS FROM AN INDIVIDUAL RETIREMENT ACCOUNT, ETC.—If a distribution from an individual retirement account or under an individual retirement annuity to the individual for whose benefit such account or annuity was established is made before such individual attains age 59½, his tax under this chapter for the taxable year in which such distribution is received shall be increased by an amount equal to 10 percent of the amount of the distribution which is includible in his gross income for such taxable year.

We first consider whether the amounts received by petitioners from MDIF constituted "distributions" from their IRA's at First Maryland, as that term is used in section 408(d). We note that whether the payments are distributions within the meaning of section 408(d) or whether the payments constitute

---

[3]Sec. 408(f) was repealed by sec. 1123(d)(2) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2475, for taxable years beginning after Dec. 31, 1986.

insurance proceeds (as argued by petitioners), such payments constitute taxable income to petitioners. Since petitioners' basis in the accounts was zero (as provided by section 408(d)(1) and section 1.408-4(a), Income Tax Regs.), the proceeds (if they are insurance proceeds) represent gain to petitioners. Thus, while there is no question that the distributions are taxable to petitioners as either an IRA distribution or as insurance proceeds, we need to decide the nature of the payments since our conclusion may affect the applicability of the additional tax under section 408(f).

State law creates interests and rights; Federal law determines what interests or rights shall be taxed. *Morgan v. Commissioner,* 309 U.S. 78, 80 (1940); *Lyeth v. Hoey,* 305 U.S. 188, 193 (1938); *Heiner v. Mellon,* 304 U.S. 271, 279 (1938); *Burnet v. Harmel,* 287 U.S. 103, 110 (1932). Therefore, we begin by examining the Maryland statutes under which MDIF took control of the funds to determine whether any provisions exist which altered or otherwise changed the character of the accounts.

MDIF was created by Maryland statute to replace the former Maryland Savings Share Insurance Corp.[4] Md. Fin. Inst. Code Ann. secs. 10-102, 10-101 (1986). Funds are appropriated to MDIF "to the extent necessary to protect holders of savings accounts in member associations", and to enable MDIF "to meet its obligations under a hardship withdrawal plan or partial distribution of assets." Md. Fin. Inst. Code Ann. sec. 10-116 (1986). Section 9-708, Md. Fin. Inst. Code Ann. (1986), authorizes the appointment of a receiver for a savings and loan association. MDIF has an absolute right to be appointed receiver of a savings and loan association insured by it. Md. Fin. Inst. Code Ann. sec. 9-709 (1986). Under Maryland law, the receiver of a savings and loan association has broad powers to operate the association's business, including all powers necessary or appropriate to liquidate the business and affairs of the savings and loan. Md. Fin. Inst. Code Ann. secs. 9-708(c) and (d), 9-702(b) (1986).

No other Maryland statute makes a more specific reference to the character of payments made by MDIF. Rather, it

---

[4]For a history of the Maryland Savings Share Insurance Corp. and MDIF, see *Chevy Chase Savings & Loan, Inc. v. State,* 509 A.2d 670, 672-675 (Md. 1986).

appears that the receiver of a financial institution has the same authority and powers to operate the institution as did the board of directors prior to the commencement of the receivership. Cases decided by Maryland State courts interpreting or applying these and related provisions do not discuss the character of the payments made to depositors under the statutory scheme, i.e., whether the nature of the accounts is somehow changed due to the failure of the financial institution. The parties have not referred us to any decisions by Maryland courts concerning the character of payments from MDIF. We have not found any such cases on our own inquiry, although we have unearthed Maryland court decisions which make reference to "insurance proceeds". See, for example, *Finci v. American Casualty Co.,* 593 A.2d 1069 (Md. 1991); *United Wire, Metal and Machine Health and Welfare Fund v. State,* 512 A.2d 1047 (Md. 1986); *Chevy Chase Savings & Loan, Inc. v. State,* 509 A.2d 670 (Md. 1986). This authority is insufficient to conclude that the Maryland legislature intended to alter the character or nature of deposits in the hands of an institution's receiver. Consequently, we conclude that the nature of the IRA deposits was not converted by operation of Maryland law.

We are also unaware of any provision under Federal law which provides that the character of the funds held in an IRA account changes under these facts. Statutes and regulations defining accounts eligible for IRA treatment do not appear to disqualify IRA's that have been transferred to State-appointed receivers or conservators following the failure of the trustee banks. See sec. 408; secs. 1.408-1 and 1.408-2, Income Tax Regs. If such were the case, we expect that Congress would have enacted, or the Secretary of the Treasury would have promulgated, provisions to ease administrative burdens caused by such a result. Further, we note that section 408(d)(3)(F) provides relief to persons whose accounts have been frozen due to the bankruptcy or insolvency of a financial institution. The statute provides that the 60-day rollover period shall not include any period during which the transferred amount is a frozen deposit. Secs. 408(d)(3)(F), 402(a)(6)(H)(i). This statute contemplates that a distribution from an IRA eligible for rollover treatment could follow the period during which access to the account was frozen. Thus, this section assumes that the

funds do not change in character since only *distributions* from a qualified IRA are eligible for rollover treatment. Accordingly, we conclude that the character of IRA deposits is not changed by the insolvency of a financial institution.

Since the payments made by MDIF as the receiver of First Maryland to petitioners were in satisfaction of the balances of their IRA's, and since we conclude that the insolvency of a financial institution and the operation of Maryland law or Federal law does not convert the nature of the IRA deposits, we accordingly hold that the MDIF payments were distributions from petitioners' IRA's and that they are includable in petitioners' income for 1986 pursuant to section 408(d).

Having decided that the amounts which petitioners received from MDIF constitute "distributions" from their IRA's, we next turn to respondent's determination that petitioners are liable for the 10-percent additional tax on early distributions under section 408(f). Section 408(f) imposes the additional tax on distributions from an IRA made before the taxpayer/owner attains the age of 59½, for the year in which the distribution is includable in the taxpayer's income. Amounts which are rolled over into another IRA within 60 days of receipt are not subject to this additional tax since they are not includable in the taxpayer's income. Sec. 408(d)(3). Petitioners argue that the additional tax should not be imposed against them because the distribution from the accounts to them was involuntary.

Section 408, including subsection (f), was added to the Code by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 2002(b), 88 Stat. 829, 959. In this comprehensive legislation, Congress addressed the growing number of employees whose employers did not sponsor qualified retirement plans, and set up a structure under which they could save for retirement in a tax-deferred manner. One goal of the legislation was to equalize the tax treatment of persons covered by qualified retirement plans and those who were not and who were forced to save for retirement from their income after tax. S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 106-107.

However, it appears also that Congress was concerned that taxpayers would not retain funds in their IRA's for the intended purpose, i.e., to provide tax-deferred retirement savings. The committee reports address this concern in connection with

the subsection (f) additional tax. The Senate report states that "Premature distributions frustrate the intention for saving for retirement, and the committee bill, to prevent this from happening, imposes a penalty tax". *Id.* at 213. Although this report does not distinguish between voluntary and involuntary distributions as the basis for imposing the additional tax, later discussion confirms that pledging an IRA as security for a loan constitutes a distribution which would then be subject to the additional tax. *Id.* at 213-214. Thus, under the committee approach, a taxpayer would not have to receive funds directly from his IRA to nevertheless be subject to the additional tax.

The House committee report takes a similar approach to the purpose of legislation creating individual retirement accounts:

> Your committee intends that savings accumulated through an individual retirement account, etc., are to be used for retirement purposes and should not be distributed before the participant reaches age 59½ or is disabled * * *. Under the bill, if there is a premature distribution, the individual's income tax otherwise due is to be increased by 10 percent of the total amount of the premature distribution that is included in his gross income for the taxable year. * * * [H. Rept. 93-779 (1974), 1974-3 C.B. 244, 379; fn. ref. omitted.]

The House report continues to recognize that the additional tax applies to any "deemed distribution", such as that which would occur in the event the account is pledged as security or a prohibited transaction takes place. *Id.* at 379, 380. Again, the House report does not discuss the additional tax in terms of "voluntary" or "involuntary" distributions, but it emphasizes the overall goal of encouraging retirement savings. The report mentions tax-free rollovers, which are possible within 60 days of receipt of a distribution, as permitting flexibility with respect to the investment of an IRA. *Id.* at 380.

We do not believe that the legislative history behind the enactment of ERISA and, more particularly, section 408 supports petitioners' contention that Congress did not intend the additional tax to apply in all cases where a distribution from an IRA was involuntary. What is clear is that Congress intended to encourage retirement savings and the retention of those savings for retirement use. Although petitioners' chosen savings institution subsequently failed and was closed, petitioners' investment was returned to them and they had the option of reinvesting in other IRA's. The imposition of the

additional tax on petitioners under these facts does not contravene legislative intent underlying section 408(f).

Petitioners cite *Larotonda v. Commissioner,* 89 T.C. 287 (1987), to support their position that respondent's determination should not be sustained. That case is distinguishable from the facts in this case. In *Larotonda,* the Internal Revenue Service (IRS) served a notice of levy against the taxpayer's Keogh account for payment of an assessed tax deficiency. In compliance with the notice, the bank withdrew the amount reflected in the notice of levy and mailed a cashier's check in that amount to the IRS. Later, respondent issued a notice of deficiency to the taxpayer determining that the taxpayer understated his income for the year in which the levy took place by not including the withdrawn funds in income, and also that he was liable for the 10-percent additional tax on early distributions from Keogh plans.[5] We reviewed the statutory history behind section 72(m)(5) and concluded that Congress intended to prevent the voluntary withdrawal of funds by taxpayers prior to retirement age during low income or loss years. *Id.* at 291. The IRS notice of levy triggered the taxable event, and we were concerned that Congress did not intend the additional tax to apply to such a situation. Consequently, we ruled for the taxpayers and concluded that they were not liable for the 10-percent additional tax.[6] Compare *Kochell v. United States,* 804 F.2d 84 (7th Cir. 1986) (withdrawal of funds from debtor's IRA by his bankruptcy trustee determined to be an early distribution and 10-percent additional tax imposed).

Petitioners here are in different circumstances than the taxpayers in *Larotonda v. Commissioner, supra.* While petitioners' receipt of their IRA funds may have been "involuntary" (their financial institution had failed and was being liquidated), petitioners had available to them an alternative: they could have rolled over the amounts into another IRA. Such alternatives did not exist for the taxpayers in *Larotonda v. Commissioner, supra,* because the funds were distributed directly to a third party. Petitioners here received the actual

---

[5]The provision relied upon by respondent in *Larotonda v. Commissioner,* 89 T.C. 287 (1987), sec. 72(m)(5), is similar to sec. 408(f)(1).

[6]However, we sustained respondent's determination that the total amount of the distribution constituted a taxable distribution. *Larotonda v. Commissioner, supra* at 291.

distribution and still possess the funds, but have yet to reinvest them in another IRA.

Petitioners argue that respondent abused her discretion by determining the additional tax against them. To support their argument, petitioners introduced newspaper articles and other documents discussing an agreement between the IRS and the State of Maryland. The agreement permitted employees to transfer funds back into the State retirement system without any penalties. The State employees who benefited from this agreement apparently acted on erroneous information and had withdrawn amounts from their State retirement plan and deposited them into IRA's; however, the funds were not eligible for rollover treatment and the employees found themselves liable for taxes as well as additions to tax for prohibited transactions. The IRS issued a letter ruling to the Maryland State retirement and pension systems board of trustees. It is not clear that this situation involved the same additional tax for which respondent determined petitioners are liable. It is clear, however, that these facts differ substantially from petitioners' situation. In any event, we are not bound by respondent's informal agreements with nonparty taxpayers. See *Rowan Cos. v. United States,* 452 U.S. 247 (1981).

We find the application of section 408(f) to petitioners proper under these facts. In light of the foregoing, respondent's determination that petitioners are liable for the additional tax under section 408(f) is sustained.

### Additional Issues

At trial, petitioners claimed that they overreported interest income received from Community Savings & Loan, which they reported as $911. They argue that the proper amount is $685.82, consisting of $183.32 received from Community Savings & Loan, and $502.50 received from Mellon Bank (which took over Community Savings & Loan during 1986).

Petitioners did not produce any documentary evidence, including statements of interest from the banks or Forms 1099 reflecting the proper amount of interest, to substantiate the lower amount of interest income which they claim to have received during 1986. In rendering our opinions, we are unable to go beyond the record created at trial by the parties.

For the lack of supporting documentation, petitioners have failed in their burden of proof. Rule 142(a).

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155.*