CAROLYN G. WILCOX, f/k/a CAROLYN G. LIETZMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilcox v. Commissioner
Docket No. 11762-90
United States Tax Court
T.C. Memo 1992-434; 1992 Tax Ct. Memo LEXIS 462; 64 T.C.M. (CCH) 339; August 3, 1992, Filed As Corrected August 17, 1992. *462 Decision will be entered under Rule 155. For Petitioner: John S. Campbell. For Respondent: Thomas F. Eagan. HAMBLEN
HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Chief Judge: Respondent determined deficiencies in and additions to the Federal income tax liability of Carolyn G. Wilcox, f/k/a Carolyn G. Lietzman (petitioner), as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)(1)
6653(a)(1) [1]
6654(a)
6661(a)
1981
$ 1,051,209
$ 262,802
$ 52,560
-
-
1982
472,294
118,074
23,615
$ 45,976
$ 118,074
1983
390,141
97,535
19,507
23,874
97,535
(Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.) The issues to be decided are: (1) Whether respondent's determination that petitioner has unreported community income for the taxable years 1981, 1982, and 1983 is arbitrary and erroneous; (2) whether petitioner has established nontaxable sources of income during the years *463 in issue; and (3) whether petitioner is liable for the additions to tax as set forth in the deficiency notice. FINDINGS OF FACT While some of the facts have been stipulated, respondent objects to a portion of the stipulation of facts on the grounds of materiality, relevance, and collateral estoppel. [1] The following is a summary of the facts relevant to the disposition of this case. [2]
*464 Petitioner, a resident alien, resided in Carrizozo, New Mexico, at the time of the filing of the petition for redetermination. In 1967, Robert W. Lietzman (Lietzman), a U.S. citizen then residing and domiciled in the State of California, left the country to sail through the Pacific region. From 1967 until 1973, Lietzman resided on his sailboat. While sailing, Lietzman met petitioner, a citizen of Australia. On January 12, 1973, petitioner and Lietzman were married in Australia. Shortly after their marriage, Lietzman established a business in Australia known as Dhyana Technical Writing for the purpose of writing operation and maintenance manuals for projects such as aluminum plants. In 1974, Lietzman sold Dhyana Technical Writing. There is no persuasive evidence in the record regarding the amount Lietzman received for the business. At that time, petitioner and Lietzman left Australia to sail along the Great Barrier Reef and through Indonesia to Singapore. The trip to Singapore took approximately 1 year. Upon arriving in Singapore, petitioner returned to Australia to wait for Lietzman to complete his trip. In May 1975, petitioner traveled to the United States, at Lietzman's *465 request, to assist Lietzman's mother in the care of his daughter from a previous marriage. Petitioner was granted resident alien status in September 1975 and remained in the United States until December 1976. In January 1977, petitioner joined Lietzman in Singapore where she remained for approximately 1 year. Lietzman started several business ventures during this period. In particular, Lietzman and an individual named Mike Forwell (Forwell) organized a Singapore corporation called Purto Trading Co. (Purto Trading). Forwell provided the initial funds for the organization of the company. (Lietzman and Forwell used Purto Trading to engage in a number of business ventures from 1977 through 1983.) Lietzman and Forwell also formed a partnership for the purpose of purchasing a barge on which they later built a floating hotel called the Dari Laut. Construction of the floating hotel was completed in late 1978. Lietzman derived additional income during this period by smuggling cigarettes into Burma. In late 1977, Lietzman invested as a partner in a nightclub in Bangkok, Thailand, called Charlie's Superstar. Shortly thereafter, in January 1978, petitioner traveled to Frankfurt, Germany, *466 to operate a travel agency that Lietzman had purchased for the purpose of providing charter flights to Bangkok. Petitioner remained in Germany for approximately 9 months before returning to Singapore. In May 1979, Lietzman invested as a partner in a second nightclub in Bangkok called Charlie's Superstar II. This nightclub was larger than the first and had shops adjoining it. In late 1979, petitioner and Lietzman decided to move permanently to the United States. At that time, Lietzman rented an apartment in San Francisco. Petitioner moved to an apartment in New York City at Lietzman's request for the purpose of investigating the possibility of opening a gallery to sell oriental art. Lietzman eventually decided against opening such a gallery. Sometime in 1980, Lietzman purchased a house in Albuquerque, New Mexico. Lietzman had previously resided in New Mexico from 1959 to 1962. In February 1980, Lietzman obtained a passport under the name John J. Murray. In June 1980, petitioner applied for permanent residence in the United States. Petitioner was granted resident alien status in October 1980. In December 1980, Lietzman purchased the Flying W Ranch, located in Lincoln County, *467 New Mexico, for $ 792,000. Lietzman gave the sellers a downpayment of $ 200,000 and assumed existing mortgages with respect to the balance. The funds for the purchase of the property originated in a joint account held by petitioner and Lietzman with Bank of America (Singapore) and arose from Lietzman's foreign businesses. Lietzman took title to the property in his name alone without the knowledge or consent of petitioner. In December 1980, Lietzman, again using the name John J. Murray, organized a Liberian corporation named Cape Elizabeth Shipping Co.
In May 1981, Lietzman purchased the O-O Ranch, also located in Lincoln County, New Mexico, for $ 2,383,943.83. Lietzman paid for the property through two checks written against an account held jointly with petitioner at Morgan Guaranty Trust Co. in New York. The funds used for the purchase originated in a joint account held by petitioner and Lietzman with Bank of America (Zurich). Lietzman again titled the property in his name alone without the knowledge or consent of petitioner. Lietzman and petitioner intended to make the O-O Ranch their home. In this regard, Lietzman commenced extensive renovation of, and improvements to, *468 the ranch headquarters that took several years to complete. In November 1982, Lietzman organized a New Mexico corporation called O-O Ranch, Inc. In September 1983, Lietzman executed various deeds purporting to transfer the O-O Ranch to O-O Ranch, Inc., without petitioner's knowledge or consent. Through subpoenas enforced at trial, respondent established that during the period December 31, 1980, through December 31, 1983, petitioner and Lietzman maintained deposits in no less than 6 foreign bank accounts (including 3 accounts in Zurich, Switzerland, 2 accounts in Nassau, Bahamas, and 1 account in Singapore). The aggregate amounts on deposit in the various foreign accounts are summarized as follows: Period Ending
Amount
12/31/80
$ 3,081,621.59
12/31/81
777,721.67
12/31/82
1,396,773.87
12/31/83
1,330,230.62
Lietzman also maintained a bank account in his name at Thai Duna Bank in Thailand. There is no further evidence in the record regarding this account. In January 1984, petitioner filed for divorce against Lietzman in Lincoln County, New Mexico. Petitioner subsequently terminated the divorce proceedings in July 1984. Lietzman did not file Federal income tax returns *469 after the taxable year 1967. In 1984, the U.S. Attorney for the District of New Mexico, with assistance from agents of the Internal Revenue Service (IRS), instituted a criminal investigation of Lietzman for possible violation of Federal internal revenue laws. Lietzman never made his books and records concerning his foreign business interests available to the IRS. While negotiating his tax liability with the IRS, both Lietzman and his attorneys represented that Lietzman had obtained a divorce from petitioner in Thailand in June 1980. The IRS special agent conducting the Lietzman investigation was aware, however, that petitioner had instituted divorce proceedings against Lietzman in Lincoln County in 1984. Lietzman eventually pled guilty to failing to file tax returns for the years 1981, 1982, and 1983 and agreed to an assessment for income taxes for those years. All of the income giving rise to Lietzman's tax liability was earned outside of the United States. Lietzman's agreement with the Government is memorialized in a document dated March 4, 1985, and entitled "Agreement as to Final Determination of Tax Liability and Waiver of Restrictions on Assessment". Petitioner was not *470 a party to the above-described agreement, nor was she consulted regarding its terms. On March 4, 1985, Lietzman, through O-O Ranch, Inc., purported to grant the IRS a mortgage lien against the O-O Ranch to secure payment of Lietzman's tax liabilities. Petitioner did not consent or join in the purported conveyance. Lietzman died in a helicopter crash in May 1985. At the time of his death, Lietzman had not made any payments to the IRS in satisfaction of his agreed liabilities. In October 1985, petitioner was appointed personal representative of the Estate of Robert W. Lietzman. Petitioner served in that capacity until October 6, 1989. Petitioner was never contacted, either in her individual capacity or as personal representative of her husband's estate, by any Thailand investor claiming an interest in the O-O Ranch. Following Lietzman's death, United New Mexico Bank brought a foreclosure action in Federal District Court with respect to the O-O Ranch. Petitioner, respondent, and the Estate of Robert W. Lietzman were each named as party defendants to the extent that each claimed an interest in the property. Petitioner asserted a one-half community property interest in the ranch *471 while respondent argued that the ranch was Lietzman's separate property. In findings of fact and conclusions of law filed on January 18, 1990, the District Court found in pertinent part that: (1) Lietzman was domiciled in either California or New Mexico from 1967 until his death in 1985; (2) petitioner and Lietzman remained married until Lietzman's death in 1985; (3) the O-O Ranch was purchased with funds earned during their marriage and thus constituted their community property; (4) the tax liability assessed against Lietzman was his sole and separate indebtedness; and (5) the IRS failed to establish that the funds used to purchase the ranch were the separate property of Lietzman. Based on these findings, the court concluded that Lietzman's purported transfer of the property to O-O Ranch, Inc., as well as Lietzman's granting of the mortgage lien to the IRS, were ineffective to defeat petitioner's interest in the property. The court held that: The federal tax lien arising on March 4, 1985 attaches only to the undivided one-half community property interest in the O-O Ranch owned by Robert Lietzman and not to the interest of Carolyn Lietzman in the O-O Ranch. The federal tax lien *472 arising on March 4, 1985 should be foreclosed against only the undivided one-half community property interest in the O-O Ranch owned by the Estate of Robert Lietzman. Petitioner, like Lietzman, failed to file Federal income tax returns for the taxable years 1981, 1982, and 1983. On March 8, 1990, respondent issued a notice of deficiency to petitioner determining deficiencies in and additions to her Federal income tax liability for the taxable years 1981, 1982, and 1983. Respondent's determination is based on a reconstruction of petitioner's share of unreported community income under the source and application of funds method of proof as follows: Application/(Sources)
1981
1982
1983
Foreign Bank Accounts
$ --
$ --
$ --
U.S. Bank Accounts
123,576.02
(42,903.02)
(61,950.43)
Property Improvements
2,514,334.74
1,076,960.26
906,811.55
Property Purchases
57,654.00
221,627.53
113,580.65
Other Investments
136,274.90
140,125.00
28,548.84
Other Items
49,491.00
47,822.38
54,432.10
Living Expenses
412,316.07
363,203.93
447,218.27
Loans
(167,937.40)
33,432.69
(42,992.31)
Total
3,125,709.33
1,840,268.77
1,445,648.67
Petitioner's one-half
1,562,854.67
920,134.39
722,824.34
of community income
*473 The parties now agree that petitioner is entitled to itemized deductions for interest paid during the taxable years 1981, 1982, and 1983 in the amounts of $ 24,745, $ 30,350, and $ 27,216, respectively. The parties further agree that petitioner is entitled to itemized deductions for real estate taxes paid during the taxable years 1981, 1982, and 1983 in the amounts of $ 1,258, $ 348, and $ 341, respectively. (Proper adjustments for these items will be reflected in the parties' computations under Rule 155.) OPINION A. Evidentiary Matters
Prior to trial, we granted respondent's motion in limine excluding from evidence at trial any testimony or documentary evidence related to respondent's motives, administrative policy, or procedures underlying respondent's determination of petitioner's tax deficiencies upon which the notice of deficiency is based. On March 19, 1991, the parties filed a supplemental stipulation of facts with regard to which respondent has raised evidentiary objections. [3] Petitioner contends that the matters in question demonstrate that respondent's determination is arbitrary. *474 It is well established that respondent's deficiency determination ordinarily carries with it a presumption of correctness and that generally the burden of proof rests with the taxpayer. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). On the other hand, when respondent's determination is shown to be arbitrary and excessive (e.g., lacking a factual foundation or rational basis), the presumption evaporates and the burden of going forward with evidence shifts to respondent. Helvering v. Taylor, 293 U.S. 507, 514-515 (1935); Berkery v. Commissioner, 91 T.C. 179, 186 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989). When a taxpayer asks this Court to find a deficiency notice to be arbitrary and excessive, he is asking this Court to look behind that notice. Normally, we will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making a deficiency determination. Riland v. Commissioner, 79 T.C. 185, 201 (1982); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). *475 The underlying rationale for not looking behind a deficiency notice is that a trial before this Court is a proceeding de novo, and our determination must be based on the merits of the case without regard to any previous record developed at the administrative level. Berkery v. Commissioner, supra at 186; Jackson v. Commissioner, 73 T.C. 394, 400 (1979). However, we have indicated our willingness to look behind the deficiency notice where there is evidence of unconstitutional conduct on the part of respondent's agents or in cases involving unreported illegal income where respondent introduces no substantive evidence but merely relies on the presumption of correctness. Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984); Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973). In the instant case, there is no evidence that respondent's agents engaged in unconstitutional conduct. Further, as discussed more fully below, respondent's determination is supported by evidence directly linking petitioner with unreported community income. Thus, respondent's determination is presumed to be correct, *476 and we will not look behind the deficiency notice in this case. [4]
B. Substantive Issues
Taxpayers are required to maintain sufficient records to establish their correct tax liability. Sec. 6001. Where a taxpayer fails to maintain the required records, or if the records maintained do not clearly reflect income, then respondent is authorized by section 446 to reconstruct income in accordance with a method that clearly reflects the full amount of income received. Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). The reconstruction need only be reasonable in light of all surrounding facts and circumstances. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970), and cases *477 cited therein. As indicated, respondent used the source and application of funds method of proof in reconstructing petitioner's share of unreported community income. This method is based on the assumption that the amount by which a taxpayer's application of funds during a taxable period exceeds his reported sources of funds for that same period has, absent some explanation by the taxpayer, taxable origins. The taxpayer may counter respondent's determination by showing that all or a portion of the applied funds arose from such nontaxable items as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period. Cheesman v. Commissioner, T.C. Memo. 1990-350. The source and application of funds method is often equated with the cash expenditures of funds method of reconstructing unreported income which in turn is a variant of the net worth method. As we explained in Petzoldt v. Commissioner, supra at 694: The net-worth method involves the ascertaining of a taxpayer's net worth at the beginning and end of a tax period, and deriving that part of any increase not attributable to reported income. This method, while effective *478 against taxpayers who channel their income into investment or durable property, is unavailing "against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before." The cash-expenditures method is based on the assumption that the amount by which a taxpayer's expenditures during a taxable year exceed his reported income has taxable origins absent some explanation by the taxpayer. [Citations omitted.] Notably, unlike the net worth method, it is not necessary in a cash expenditures case for respondent to precisely determine the taxpayer's opening and closing net worth for the period in question. Nonetheless, the proof generally must make clear "the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." Taglianetti v. United States, 398 F.2d 558, 565 (1st Cir. 1968), affd. per curiam on another issue 394 U.S. 316 (1969). In contrast to the cash expenditures and net worth methods, respondent may employ the source and application of funds method on the assumption that the taxpayer's net worth will remain constant throughout *479 the taxable period. The taxpayer has the burden of proof to show that respondent's assumption is incorrect. See Cheesman v. Commissioner, supra; Jones v. Commissioner, T.C. Memo. 1983-110; Roundtree v. Commissioner, T.C. Memo. 1980-117; Troncelliti v. Commissioner, T.C. Memo. 1971-72. Petitioner argues that, regardless of whether respondent's determination is presumed correct, respondent's tactics in this case were arbitrary and unreasonable. In particular, petitioner contends that it was unreasonable for respondent to reconstruct her income and issue a deficiency notice to her 5 years after the death of her husband. Petitioner emphasizes that it was her husband who earned the disputed income and that "She had very limited access to her husband's books and records during his lifetime, and no access whatsoever to them after his death." In light of her lack of means for defending herself, petitioner asserts that respondent's methodology is patently unreasonable. As previously discussed, section 446 confers broad powers on respondent to use any reasonable means of reconstructing income. In our *480 view, respondent is entitled to greater latitude in determining which method of reconstruction to apply where, as in the instant case, the taxpayer has failed to file the required tax returns. Petzoldt v. Commissioner, supra at 693. Under the circumstances, we cannot agree with petitioner that respondent's methods were either unfair or unreasonable. By virtue of nonexistent or missing records and petitioner's failure to file tax returns, respondent had no choice in this case but to reconstruct petitioner's income through an indirect method. Moreover, the delay with respect to the issuance of the deficiency notice in this case appears to have been caused by Lietzman's misrepresentation to respondent's agents regarding his marital status, as well as the time required for the parties to resolve the foreclosure case. In any event, petitioner admits that she had little access to her husband's records either before or after his death. Thus, petitioner's inability to defend herself in this proceeding is more directly attributable to her lack of access to records than to any delay caused by respondent. Petitioner further contends that respondent's determination *481 is arbitrary and erroneous on the grounds that: (1) Respondent is collaterally estopped (by virtue of the decision of the District Court in the foreclosure case) from determining that any income earned by Lietzman during the years in issue is community income; (2) there is no substantive evidence in the record establishing that any of the income earned by Lietzman during the years in issue is community income; and (3) the methodology employed by respondent in reconstructing petitioner's share of community property income is inconsistent with standards established by the Supreme Court in Holland v. United States, 348 U.S. 121 (1954). We will address petitioner's various contentions in the order set forth above. Petitioner asserts that respondent is collaterally estopped from arguing that Lietzman's income is community income. More specifically, petitioner maintains that the District Court concluded in the foreclosure case that Lietzman's taxable income was his sole and separate income. We disagree. The District Court found that the O-O Ranch was purchased with funds earned during the marriage of petitioner and Lietzman. The District Court further found that *482 the Government failed to establish that the funds were Lietzman's separate property. Based on these findings, the court concluded that the property was community property and that Lietzman's purported transfer of the property to O-O Ranch, Inc., as well as Lietzman's granting of the mortgage lien to the IRS, were ineffective to defeat petitioner's interest in the property. The District Court did not find that Lietzman's income was his separate property, nor was such a finding necessary. Rather, the District Court merely concluded that, because petitioner was not a party to Lietzman's closing agreement, the agreement reflected Lietzman's separate debt. See N.M. Stat. Ann. sec. 40-3-9A(3) (Michie 1978, 1989 Repl.) (Separate debt is defined as debt designated as a separate debt of a spouse by a judgment or decree of any court having jurisdiction). In this light, the District Court's decision in no way precludes respondent's determination that petitioner is liable for tax on her share of unreported community income. Petitioner next contends that respondent's determination is arbitrary on the ground that there is no substantive evidence in the record establishing that any of the *483 income earned by Lietzman during the years in issue is community income under State law in New Mexico. Petitioner emphasizes that the District Court made no specific findings in this regard. We agree with petitioner that the District Court's findings do not relate specifically to the proper characterization of all of the income earned by Lietzman during the years in issue. Nonetheless, when considered together, the District Court's various findings support respondent's determination that petitioner's expenditures arose directly from unreported community income. The District Court found in pertinent part that: (1) Lietzman was domiciled in either California or New Mexico (both community property States) throughout the period from 1967 until his death in 1985; (2) petitioner was married to Lietzman from 1973 until Lietzman's death in 1985; (3) petitioner was granted resident alien status in the United States in 1980 and remained a resident of this country throughout the period in question; and (4) Lietzman acquired interests in several business ventures during his marriage to petitioner. Community property generally is defined in both California and New Mexico as all property acquired *484 by a husband or wife, or both of them, during their marriage and while domiciled in such State. See Cal. Civ. Code sec. 5110 (West 1983, 1992 Cum. Supp.); N.M. Stat. sec. 40-3-8B (Michie 1978, 1989 Repl.). California and New Mexico laws further provide for a presumption that property acquired during marriage is community property. [5] See N.M. Stat. Ann. sec. 40-3-12 (Michie 1978, 1989 Repl.); In Re Marriage of Mix, 14 Cal. 3d 604, 536 P.2d 479, 483 (1975). Consistent with these precepts of community property law, and in light of the District Court's various findings, respondent was justified in determining that Lietzman's foreign business interests, acquired during his marriage to petitioner, represented community property. It necessarily follows that the income derived from those ventures is properly characterized as community income. There is *485 no question that petitioner, a resident alien, is subject to income tax under section 1. Sec. 1.1-1(a), Income Tax Regs. Thus, in the absence of an explanation to the contrary, we conclude that respondent was justified in determining that petitioner's large expenditures during the years in issue arose from her share of unreported community income generated by Lietzman's several ventures. Petitioner offered testimony at trial intended to demonstrate that the expenditures in question did not arise from income generated by community property assets. Specifically, petitioner attempted to prove that: (1) Lietzman's business ventures were acquired with separate assets; and (2) a portion of the expenditures in question reflect amounts received from, and invested on behalf of, Thai nationals. In short, we find the testimony presented on both points to be self-serving, incomplete, and incredible. Evidence regarding Lietzman's separate assets is particularly wanting. Moreover, petitioner has stipulated, and we have found, that she was never contacted, either in her individual capacity, or as personal representative of her husband's estate, by any Thailand investor claiming an interest *486 in the O-O Ranch. Accordingly, we conclude that Lietzman's various business interests represent community property and that the expenditures in question generally derived from unreported community income. Petitioner also contends that respondent's method of reconstructing her income is arbitrary and excessive on the ground that respondent failed to comply with the standards imposed by the Supreme Court in Holland v. United States, supra. Specifically, petitioner contends that respondent failed to determine the extent to which cash on hand in foreign bank accounts could have accounted for the expenditures during the period in question. Petitioner's reliance on Holland is misplaced. The standards prescribed by the Supreme Court in that case relate specifically to the net worth method of reconstructing unreported income. As previously discussed, the net worth method of proof and the source and application of funds method (applied by respondent in the instant case) are two distinct methods of proof. The most significant distinction is that while respondent must establish a beginning net worth with reasonable certainty under the former method, respondent *487 may proceed under the source and application of funds method on the assumption that the taxpayer's net worth will remain constant during the period in question. See, e.g., Cheesman v. Commissioner, T.C. Memo. 1990-350. Thus, while petitioner is permitted to present evidence to establish cash hoard as a nontaxable source for her expenditures, the Holland case does not support the proposition that respondent's determination is somehow arbitrary. Respondent was hindered in her effort to accurately reconstruct petitioner's share of unreported community income by foreign bank secrecy laws. Having no direct access to information concerning amounts petitioner and Lietzman had on deposit in foreign accounts, respondent assumed that any such deposits remained constant during the applicable period. Under the circumstances, respondent's assumption was both necessary and reasonable. In any event, it is now evident that petitioner and Lietzman had substantial deposits in foreign bank accounts during the period in question. Through subpoenas enforced at trial, the parties were able to determine, and we have found, that the following amounts were on deposit with foreign *488 banks during the pertinent period: Period Ending
Amount
12/31/80
$ 3,081,621.59
12/31/81
777,721.67
12/31/82
1,396,773.87
12/31/83
1,330,230.62
The impact of these deposits on the determination of petitioner's share of unreported community income will be reflected in the parties' computations under Rule 155. Foreign bank deposits aside, petitioner further contends that: In the 1985 agreement [with Lietzman] the Commissioner must have agreed that certain of the expenditures made during 1981, 1982 and 1983 constituted taxable income earned in those years. Mr. Lietzman's reported or determined taxable income for 1981, 1982 and 1983 must, therefore, be considered in the Commissioner's income reconstruction as if it was reported income. [Emphasis in original.] Petitioner appears to believe that, as a consequence of her husband's settlement, she is entitled to some credit or offset in the computation of her unreported income. Again, we disagree. Lietzman's agreement with the Government represents a negotiated settlement of his individual tax liability. Petitioner was not a party to that agreement, nor was she consulted regarding its terms. Simply stated, *489 Lietzman's agreement is irrelevant and immaterial for purposes of this proceeding and, consequently, we refuse to consider it further. See Kroh v. Commissioner, 98 T.C. 283 (1992) (slip op. at 19-21) (Court reviewed). For the same reason, we reject petitioner's contention that the taxable income forming the basis of Lietzman's closing agreement with the Government somehow sets a cap on the amount of community income that is attributable to her. Kroh v. Commissioner, supra.
C. Additions to Tax
Respondent determined that petitioner is liable for the addition to tax under section 6651(a)(1) for each of the taxable years in issue. Section 6651(a)(1) provides for an addition to tax unless the taxpayer shows that his or her failure to file a timely return was due to reasonable cause and not willful neglect. Petitioner maintains that, in light of respondent's settlement with her husband, she reasonably believed that Lietzman's income was his separate income and that she was not subject to taxation on the those amounts. The record does not support this contention. In particular, no representations were made to petitioner that Lietzman's *490 settlement would relieve her of tax liability, nor has petitioner suggested that she sought professional advice regarding her obligations to pay tax. From our viewpoint, it appears that petitioner effectively ignored her obligation to file Federal income tax returns. Consequently, respondent's determination under section 6651(a)(1) is sustained. Respondent determined that petitioner is liable for the additions to tax under section 6653(a)(1) and (2) for each of the taxable years in dispute. Section 6653(a)(1) and (2) provides for additions to tax if an underpayment of tax required to be shown on a return is due to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). For the reasons stated in sustaining respondent's determination under section 6651(a)(1), we likewise conclude that petitioner is liable for the additions to tax for negligence under section 6653(a)(1) and (2). In short, petitioner did not take the steps reasonably necessary to ensure that her tax liability was properly reported during the years in dispute. *491 Emmons v. Commissioner, 92 T.C. 342 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Respondent determined that petitioner is liable for additions to tax under section 6654 for the taxable years 1982 and 1983. Section 6654 provides for additions to tax for the underpayment of estimated tax. Because petitioner did not pay estimated tax, respondent's determination is sustained. Respondent further determined that petitioner is liable for the addition to tax pursuant to section 6661(a) for each of the taxable years 1982 and 1983. Section 6661(a) imposes an addition to tax when there is a "substantial understatement of income tax for any taxable year". As applicable here, the rate of the addition to tax under section 6661(a) is equal to 25 percent of the underpayment attributable to the substantial understatement. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). Section 6661(b)(2)(A) defines "understatement" to mean the excess of the amount of tax required to be shown on the return over the amount of tax actually reported on the return. This understatement will be "substantial" if the amount of such understatement exceeds *492 the greater of 10 percent of the amount of tax required to be shown on the return for the taxable year, or $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by the portion of the understatement attributable to any nontax shelter item for which there was either substantial authority for the taxpayer's return position or adequate disclosure in the return of the relevant facts affecting the treatment of such item. Sec. 6661(b)(2)(B)(i) and (ii); Schirmer v. Commissioner, 89 T.C. 277, 283-284 (1987). Petitioner has failed to present any authority supporting her position. Accordingly, respondent's determination is sustained. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest due on the deficiency for each of the taxable years 1981, 1982 and 1983 pursuant to section 6653(a)(2)↩.
1. See infra↩ note 4. 2. In 1988, United New Mexico Bank brought a foreclosure action in the U.S. District Court for the District of New Mexico joining the O-O Ranch Inc., petitioner, the Estate of Robert W. Lietzman, and respondent as defendants. In findings of fact and conclusions of law issued in January 1990, the District Court ruled in pertinent part that the ranch was the community property of petitioner and Robert W. Lietzman. Because many of the court's findings of fact are directly relevant to the instant proceeding, and because both petitioner and respondent had a full and fair opportunity to present their respective positions therein, the parties are estopped to deny the District Court's findings of fact in this case. See Meier v. Commissioner, 91 T.C. 273↩ (1988). The pertinent findings of fact of the District Court are incorporated herein.
3. Respondent objects to paragraphs 81 through 100 of the supplemental stipulation of facts on the grounds of materiality, relevance, and collateral estoppel.↩
4. While we agree with respondent that much of the supplemental stipulation is of questionable relevance and materiality, we see no benefit in going through the stipulation item by item at this point. Rather, our determination regarding relevance and materiality is reflected in our findings of fact.↩
5. Such presumptions are necessary because (as is the case here) records of how property is acquired are often incomplete or nonexistent.↩